Dayis, J.,
delivered tbe opinion of tbe court:
The nature of tbe title which tbe State of Wisconsin acquired by tbe act of June 3,1850, is settled by tbe decision of tbe Supreme Court in Schulenberg v. Harriman (21 Wall., 44):
“The act passed a present interest in tbe lands designated. * * Tbe power of disposal and tbe provision for tbe lands reverting both imply what tbe first section in terms declares, that a grant is made; that is, that tbe title is transferred to tbe State. It is true that tbe route of tbe railroad, for tbe construction of which tbe grant was made, was yet to be designated, and until such designation tbe title did not attach to any specific tracts of land. Tbe title passed to sections to be afterwards located. When the route was fixed, tbe locationbecame certain, and tbe title, which was previously imperfect,, acquired precision and became attached to tbe land. * * * The provision in tbe act, that all lands remaining unsold after ten years shall revert to tbe United States if tbe road be not then completed, is no more than a provision that tbe grant shall be void if a condition subsequent be not performed. * * * It is settled 'law that no one can take advantage of tbe non-performance of a condition subsequent annexed to an estate in fee but tbe grantor or bis heirs, or tbe successors of tbe grantor if tbe grant proceed from an artificial person; and if they do not see fit to enforce their right to a forfeiture on that ground, tbe title remains unimpaired in tbe grantee.”
But this grant, though made in fee and defeasible on condition subsequent, was also in trust—
“ For tbe purpose of aiding in tbe construction of a railroad from Madison or Columbus by tbe way of Portage City to tbe St. Croix Eiver or Lake, between townships twenty-five and thirty-one, and from thence to tbe west end of Lake Superior and to Bayfield. * * Tbe lands hereby granted to said State shall be disposed of by said State only in manner following; that is to say, that a quantity of land, not exceeding one bun-, dred and twenty sections, and included within a continuous length of twenty miles of road, respectively, may be sold, and when tbe governor of said State shall certify to tbe Secretary of tbe Interior that any twenty continuous miles of either of said roads are completed, then another like quantity of land hereby granted may be sold, and so, from to time, until said roads are completed.”
To tins trust tbe foEowing condition was attached:
“ That tbe United States mail shall be transported over said roads, under the directions of tbe Post-Office Department, at such price as Congress may bylaw direct: Provided, That until *140 sucb price is fixed by law tbe Postmaster-General shall have the power to determine the same.”
This condition was intended to attach, and could only attach, to a railroad which the trustee should construct or cause to be constructed in whole or in part by the use of the property conveyed in trust.
The State executed the trust thus reposed in it by conferring upon the La Crosse and Milwaukee Eailroad Company, a preexisting corporation, whose proposed railroad would pass over 61.G miles of the route contemplated by Congress, the further right to construct the Congressional road and receive the benefit of the land grant; but the measures taken by the State to transfer the land grant to the company differed radically from those taken by Congress to pass the lands to the State. Congress made a statutory grant inprcesenti; but the State, although declaring that the rights granted by Congress were thereby granted to the company, enacted that the title to the lands should vest in said company only as the governor of the State should certify to the Secretary of the interior that a section of twenty miles was completed so as to admit of running regular trains over it; and it further made it the duty of the governor, “ in his official capacity and in behalf of the State and under the great seal thereof, to execute and deliver to the La Crosse and Milwaukee Eailroad Company, whenever it should by virtue of the provisions of the act be entitled to any of said lands, a deed in fee-simple of any of the lands to which said company should be entitled.”
It is manifest that the railroad company did not acquire title by the mere passage of the statute, as did the State of Wisconsin. By the completion of a section, according to the terms of the act, they acquired a right in equity to demand legal title from the State; but the State clearly proposed to keep within itself the legal title until its governor should execute and deliver the deed or deeds contemplated by the act.
That it was the trustees’ duty to retain such control over the trust property as would enable it to enforce the application of it to the object of the trust in the manner contemplated by Congress is i>lain. Whether the State used the power which it thus retained justly or unjustly, wisely or unwisely, toward the La Crosse and Milwaukee Eailroad Company and toward their privies in estate, among whom are the claimants, is not for us *141 to determine. We are to be governed by tbe undisputed facts that after tbe La Crosse and Milwaukee Eailroad Company bad constructed 61.6 miles of railroad on tbe line projected by Congress, and under tbe authority derived from tbe statute wbicb tbe State bad enacted to carry out tbe trust wbicb it bad assumed toward Congress, tbe State refused to give tbe company tbe benefit of tbe trust property; and that neither that company nor any of its privies in estate has ever received tbe least direct benefit from tbe trust. On tbe contrary, after repeated efforts on tbe part of that company and of tbe trustees of their mortgage and of tbe claimants to secure some benefit from it, tbe claimants finally acquiesced in a different disposition of tbe trust property made by tbe State for tbe benefit of other parties with tbe consent of Congress, tbe creator of tbe trust.
Tbe defendants contend that tbe new disposition of tbe property is in fact an equitable execution of tbe original trust, and that they are therefore still entitled, to tbe benefit of tbe condition attached to it. We will consider this proposition.
It seems that tbe farmers along tbe line of the La Crosse and Milwaukee Eailroad and tbe farmers along tbe line of a railroad from Milwaukee to Iloricon bad subscribed to tbe stock or bonds of those respectives companies, and bad paid their subscriptions by mortgages on their farms. In tbe commercial crash of that time tbe Iloricon road went down as well as tbe La Crosse road. While tbe railroad investments of tbe farmers turned out badly, tbe mortgages remained on their farms. In tbe reorganization tbe claimants.became proprietors both of tbe La Cross road and of tbe Iloricon road. On behalf of its citizens, tbe State proposed to tbe claimants that it should apply tbe old La Crosse land grants to recoup tbe losses of tbe farmers on tbe lines of both roads. Congress having assented to this diversion of tbe trust property, tbe claimants gave their consent to it, and, apparently in order to quiet title, executed a quitclaim deed of all their interest in tbe lands to a corporation representing the owners of tbe mortgaged farm lands.
It was argued by tbe defendants that, as tbe road was constructed in part by tbe mortgage subscriptions of tbe farmers, this is in fact such an equitable appbcation of tbe lands to tbe construction of tbe road as entitles tbe government to the benefit of tbe provision of tbe act of June 3, 1856, relative to postal rates.
*142 We are unable to see bow these lands, when used with the consent of Congress for the payment of old debts contracted by individual subscribers to the stock or securities of a railroad company, can be regarded as either directly or remotely “ exclusively applied in the construction of the road for which they were granted and selected,” which is what the trust calls for. It seems to us that they are used to indemnify persons in Wisconsin who had made bad investments in railways within its-borders, and for no other purpose. Being so used with' the assent of the United States, the latter are estopped from now claiming that they are applied to the uses named in the act of 1850. Even on tire defendant’s theory that the lands were indirectly used in the construction of a railway, it was a irse for the construction of the Horicon road as well as the La Crosse road, and was so far a violation of the provisions of the act of 1850.
We are therefore of opinion that no portion of the claimants’' road was constructed in whole or in part by a land grant within the meaning of section 13 of the Act July 12, 1870 (19 Stat. L., 82), and that for this reason the defendants are not entitled to deduct twenty per cent, from the contract price due the claimants for carrying the mails. This makes it unnecessary for iis to consider the further question raised by the claimants, whether the provisions of said section 13 apply to pre-existing contracts made with land-grant roads.
The defendants further contend that they are in any event entitled, under the provisions of the first section of said act of July 12, 1870, after the 1st day of July, 1870, to deduct ten per cent, from the contract price for carrying the mails. That section requires the Postmaster-General to readjust the compensation to be paid from and after the 1st July, 1870, for transportation of mails on railroad routes by reducing the transportation to all railroad companies for the transportation of mails ten per centum per annum from the rates fixed and allowed in the first section of the act of March 3,1873. It is found, as a fact, that the rates in the-claimants’ contract were calculated on the basis of the conditions and at the rates prescribed in said act of 1873. We are therefore called upon to-decide -whether the rates named in the claimants’ unexpired contract could be affected by the arbitrary act of the defendants alone.
*143 We are all of opinion that when a contract for a term of time is made under due authority of law by duly-authorized agents-of the United States, the United States cannot by their own legislative act vary the terms of the contract in their own favor without the assent of the other party. If there were no other-question involved, it would not be necessary to go further with this branch of the case. The contention of the defendants, however, goes beyond'this. They maintain, first, that the contract was not authorized by statute; and, second, that by the terms of the contract they were authorized to change the rate in the manner in which it was done.
It is enacted in the Bevised Statutes by section 3956, that no contract for carrying the mail shall be made for a longer term than four years; and by section 3679 that no department of the Government shall involve the Government in any contract for the future payment of money in excess of appropriations made by Congress for that fiscal year; and by section 3732 that, with the exception of certain contracts in the War and Navy Departments, no contract shall be made unless the same be authorized by law, or be under an appropriation adequate to. its fulfillment.
The contract between the claimants and the defendants was-made on the 8th September, 1875,. for a term of four years, in accordance with an extensive usage in the Post-Office Department. It was undoubtedly authorized by section 3956 of the Bevised Statutes, unless, as contended by the defendants, that section is explained, controlled, and limited by the provisions of sections 3679 and 3752.
Section 3679 was taken by the revisers from the seventh section of the Legislative, Executive, and Judicial Appropriation Act, July 12, 1870 (16 Stat. L.-, 251); section 3732, from the tenth section of the Sundry Civil Act, March 12, 1861 (12 Stat. L., 220). The provisions of section 3956 are to be found in the-two hundred and fifty-sixth section of the Act to revise, consolidate, and amend the statutes relating to the Lost-Office Departmentr June 8,1872 (17 Stat. L., 315). This being the later act, and being a revision of all pre-existing laws relating to the Post-Office Department, its provisions undoubtedly at the time of its passage controlled those of prior statutes, even if apparently in conflict with it.
*144 Before tbe enactment of tlie Eevisecl Statutes the Postmaster-G-eneral bad, therefore, authority to contract for carrying the mails on a railroad route for four years. We think that the Bevised Statutes made no change in the pre-existing law in this respect. The contract with the claimant was one authorized by law, and its term is for four years unless sooner terminated under its own provisions.
The ninth article of that contract authorized the Postmaster-General to discontinue the service in whole or in part at any time, allowing as a full' indemnity to the contractor one month’s extra pay on the amount of service dispensed with, and a pro rata compensation for the amount of service retained and continued.
The act of July 12,1876, was a public act, of which the claimants were bound to take notice. The statutory directions to the Postmaster-General were also a notice to the claimants that the service would be discontinued under the old rates, and would be continued, if at all, under the new rates. After this notice the claimants were at liberty to stop carrying the mails; in which case the defendants would have been obliged either to continue to pay the old rates or to terminate the contract and pay the month’s extra pay.
The claimants, however, made no objection to the notice contained in the statute; and, so far as appears in this case, continued to render the service under the new law without dissent or protest. We must presume that they acquiesced in its provisions and accepted the change which it made in their contract.
The reduction, however, can only be made for the period subsequent to July 12, 1876, the day when the notice was given. For all service up to that date the claimants are entitled to pay at the contract rates; after that time at such rates less ten per cent. They are therefore entitled to judgment for the sum of $124.48 for the balance due them for services performed at the old rates, and $3,761.51 for the balance due them for service at the new rates up to and including January 31, 1878.