*129 OPINION.
Davis, J.,
delivered tbe opinion of tbe court:
It is admitted that tbis case differs in no material respect from tbe cases of tbe Chicago, Milwaukee and Saint Paul Eail-way Company, decided by tbis court at tbe December term, 1878 (14 O. Cls. E., 125), as supplemented by tbe Obicago and Northwestern Eailway Company’s Case, decided at tbe December term, 1879 (15 0. Cls. E., 232); both reversed by tbe Supreme Court for errors of law (104 U.S. E., 680 and 687).
Tbe counsel for tbe Government, in explanation of tbe request for a rebearing on tbe points settled in those cases, presents with bis brief tbe following letter from tbe Postmaster-General:
Post-Office Department,
Office of the Postmaster-General,
Washington, D. C., March 30, 1882.
Hon. S. F. Phillips,

Acting Attorney-General, Washington, D. C. :

Sir: * * I have read the opinion of that court, as delivered by Mr. Justice Matthews (Chicago and Northwestern Railway Company). The briefs in the ease I have not seen; hut I ventare to submit for your consideration one comment upon the opinion of the court.
That opinion assumes that the Postmaster-General was authorized by the Act of 1872 to contract with any railroad company, whether a land-grant road or another, for carrying the mails; that being so authorized he did contract with the Chicago and Northwestern Company in 1875, and that having so contracted, Congress could not by act change the terms of the contract,'in 1876.
Unless the point was considered by the court, I venture to doubt whether the Postmaster-General had any authority whatever to contract with any land-grant road. The same act, the same breath, which authorized the Postmaster-General to make contracts with railway companies affirmed also the duty of land-grant roads to carry mails at prices fixed by Congress. (See sections 214 and 265, chap. 335, of the laws of 1872.)
It does not seem to me quite reasonable to hold that Congress, at the same time it affirms the duty of that class of roads to carry mails, upon prices fixed by Congress, should authorize the Postmaster-General to annul or abrogate that power by a contract of his own.
I am, very respectfully, your obedient servant,
T. 0 Howe,

Postmaster- General.

Eacb of tbe cases referred to received tbe assent of all tbe members of tbis court after careful examination and consultation; and eacb was reversed in tbe court above with equal una *130 nimity. As tbe Postmaster-General seems to question tbe result reached, a proper respect for that officer calls upon us to re-examine our own action in order to determine whether the points he now raises were not considered by us, and were not before the higher court.
In the Bevised Statutes it is enacted as follows (omitting such parts of the sections as are not necessary to the proper consideration of this case):
SECTION 3942. The Postmaster-General may enter into contracts for carrying the mail with, railway conqianies without advertising for bids therefor.
Section 3956. No contract for carrying- the mail shall be made for a longer term than four years.
Section 3997. The Postmaster-General shall arrange the railway routes on which the mail is carried * * * so that each railway company shall receive, as far as practicable, a proportionate and just rate of compensation, according- to the service performed.
Section 3998. The pay for carrying the mail on any railway of the first class shall not exceed three hundred dollars per mile per annum; on any railway of the second class it shall not exceed one hundred dollars per mile per annum, and on any railway of the third class it shall not exceed fifty dollars per mile per annum; hut if one-half the service on any railway is required to be performed in the night time, the Postmaster-General may pay twenty-five per centum in addition to the above maximum rates.
Section 4000. Every railway company carrying the mail shall carry on any train which may run over its road, and without extra charge therefor, all mailable matter directed to be carried thereon, with the person in charge of the same.
Section 4001. All railway companies to which the United States have furnished aid by grant of lands, right of way, or otherwise, shall carry the mail at such prices as Congress may by law provide, and until such price is fixed by law the Postmaster-General may fix the rate of compensation.
Section 4002. The Postmaster-General is authorized and directed to readjust the compensation hereafter to be paid for the transportation of mails on railroad routes upon the conditions and at the rates hereinafter mentioned.
First. That the mails shall be conveyed with due frequency and sj>eed, and that sufficient and suitable room, fixtures, and furniture in a car or apartment properly lighted and warmed shall be provided for route agents to accompany and distribute the mail.
Second. That the pay per mile per annum shall not exceed the following rates. * *
Under these jiro visions of law the United States, on the 1st day of July, 1875, contracted with the Chicago, Milwaukee and Saint Paul Bailway Company for transportation of mails over its road for a term of four years at a rate of compensation graded *131 according to tbe provisions of Eevised Statutes § 4002. Tbe contract further contained tbe following provision:
9th. That the Postmaster-General may discontinue or curtail the service in. whole or in part whenever the public interests, in his judgment, shall require such discontinuance or curtailment for any cause; he allowing, as a full indemnity to the contractor, one month’s extra pay on the amount of service dispensed with, and a pro rata compensation for the amount of service retained and continued.
By the first section of tbe Act of July 12, 1876, chap. 179, it was enacted—
That the Postmaster-General he, and he is hereby, authorized and directed to readjust the compensation to be paid from and after the first day of July, 1876, for transportation of mails on railroad routes by reducing the compensation to all railroad companies ten per centum per annum from the rates fixed and allowed by the first section of an act entitled “An act making appropriations for the service of the Post-Office Department for the fiscal year ending June 30,1874, and for other purposes,” approved March 3, 1873, for the transportation of mails on the basis of the average weight. (Richardson’s Supplement to Revised Statutes, 224.)
The provision in tbe Act of March 3,1873, therein referred to, is tbe one incorporated into tbe Eevised Statutes as section 4002.
By tbe thirteenth section of tbe Act of July 12, 1876, it was further enacted—
That railroad companies whose railroad was constructed in wholo or in part by a land grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct shall receive only eighty i>er centum of the compensation authorized by this act. (Richardson’s Supplement to Revised Statutes, 226.)
The Postmaster-General applied tbe provisions of tbe Act of 1876 to tbe contract with tbe Chicago, Milwaukee and Saint Paul Eailroad Company. There was a controversy whether tbe road was subject, as a land-grant road, to tbe provisions of tbe thirteenth section of that act. This court decided that it was not a land-grant road (14 C. Cls. R., 125), and its decision was substantially sustained above. (104 U. S. R., 687.) There was also a contention whether it was subject to tbe provisions of tbe first section of tbe act, reducing all rates 10 per centum. On this point our judgment was adverse to tbe company, and was reversed above. In tbe opinion which accompanied our judgment, we laid down some propositions of law, resting upon others, which, although not stated, were necessarily implied by the course of argument.
*132 1. Contracts made by tbe Executive for tbe payment of money from tbe Treasury derived tbeir validity from legislative authority.
Section 3732 of tbe Eevised Statutes codifies this proposition as to some kinds of contracts:
No contract or purchase on behalf of the United States shall be made unless the same is authorized by law or is under an appropriation adequate to its fulfillment, except in the War and Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.
Tbis principle, wbicb we assumed as tbe basis of tbe reasoning by wbicb we reached our conclusion, has not been, and probably will not be, questioned. Tbe Constitution says that “ no money shall be drawn from tbe Treasury but in consequence of appropriations made by law.” It provides for tbe distribution of tbe work of carrying on tbe Government in different executive Departments. Congress has organized Departments under tbe Constitution; and has charged them with tbe conduct of executive business; and makes appropriations for carrying on that business; and provides accounting machinery in tbe Treasury for determining bow much shall be paid for it; and delegates a portion of its power to tbis court, authorizing it to render judgments wbicb shall be respected and paid at tbe Treasury out of a general appropriation for that purpose. But no one will probably contend that if Congress fails to confer upon the Executive power to expend tbe public money for a given purpose it is within tbe constitutional power of tbe Executive to bind tbe United States, either directly or by implication, to pay it for such a purpose; or that tbe courts should recognize such a contract, and give a judgment upon it to be satisfied under a general appropriation act. Such a case is not to be confounded with one in which it becomes tbe duty of a court to render judgment against tbe United States because Congress has failed to make an appropriation to meet payments due under a valid contract; or with one in wbicb tbe United States has received tbe benefit of labor or material without a contract, under general provisions of law. Confining tbe expression of opinion to tbe exercise of tbe constitutional power by Congress to determine bow much money shall be appropriated from tbe Treasury and for what purposes, we then bad and still have no doubt that tbe absolute control of tbe money of tbe United States is in Con *133 gress, and that it is the duty of the executive and judicial Departments of the Government to observe its will in that respect; and we do not understand that this principle is questioned by the Supreme Court.
2. The contract sued on in that suit was authorized by statute. It was contended on the part of the United States that the Postmaster-General had no authority to contract for four years. We decided that the statute gave him that power, and the Supreme Court held that we were right. That officer might have made an absolute contract for that term. Had he done so, the decision in the claimants’ favor on that point would have terminated the case. He did not do so, however. He made a contract for four years, terminable at any time on notice by the Government of discontinuance of the service, with extra payment for one month. It was the attempt by the Postmaster-General to execute this reserved power which raised the issues settled by that suit.
3. While the terms of a valid contract with the United States could not be varied (whether by the Legislature or the Executive) without the assent of both parties, a discontinuance of the service effected under the ninth clause of the contract was not a variation. We do not suppose th at this holding was erroneous. There is certainly nothing in the opinions of the Supreme Court looking that way.
4. That the notice required by the ninth provision of the contract could be given as effectually by the Legislature as by the Postmaster-General as the agent of the Legislature.
This proposition rests in part upon the first proposition and in part upon the settled principle that all persons being within the limits of a sovereignty are presumed to know the provisions of public law. Assuming that the legislative will was to govern the disposition of the public moneys so far as it could lawfully do so without affecting the validity of contracts, we thought that rules of public policy, as well as settled principles, required us to hold that the expression of that will reached the parties directly through the statute without waiting to percolate through the bureau of an executive Department. A careful examination of the opinions of the Supreme Court in these cases fails to reveal that the judges of that court did not agree with us. On the other hand it appears to have been recognized as a sound principle in Bradley v. The United, States (98 U. S. R., 104).
*134 5. As a conclusion from the previous propositions we held that the act terminated all contracts which were terminable at the will of Congress, and which Congress intended by the act to terminate. Down to this point there is no appearance that the Supreme Court found this court in error.
6. That Congress intended by the Act of July 12,187C, to induce by 10 per cent, the mail transportation pay of all railroad companies whose contracts it could lawfully change.
The act directed the Postmaster-General to readjust the compensation for transportation of mails on railroad routes by reducing the compensation to all railroad companies. This court was of opinion that Congress by using the word 11 all” intended to reach all railroads and all railroad contracts for mail transportation which the Executive could lawfully terminate, leaving the companies to decide whether they would make the new - agreement prescribed by Congress, or would cease to carry the mails. It necessarily followed from this course of reasoning that the contract of the Chicago, Milwaukee and Saint Paul Eailway Company Avas terminable; that it was the intent of Congress to terminate it; and that it was abrogated by the act.
The Supreme Court finds us in error in this construction of the statute. In the case of the Chicago and Northwestern Railway Company (104 U. S. R., 680), to which we shall soon refer more in detail, and which appears to have been considered with the Chicago and Milwaukee Case, it says of this and a similar statute:
Their language may he well satisfied Toy confining them to oases where no time contracts for service were then in existence, and to contracts thereafter to he entered into. They do not legitimately apply to contracts then existing.
And in the Chicago, Milwaukee and Saint Paul Case, the Supreme Court says:
This act was not intended to apply to the caso of contracts previously made for a term of years not expired Avheu it took effect.
By the Act of June 17,1878, ch. 259 (Eichardson’s Supplement to Eev. Stat., 358), it was further enacted:
That the Postmaster-General be, and he is hereby, authorized and directed to readjust the compensation to be paid from and after the 1st day of July, 1878, for transportation of mails on railroad routes by reducing the compensation to all railroad companies, for the transportation of mails, 5 per centum per annum fromtherates for the transportation of mails on the basis of the average weight fixed and allowed by the first section of an act en *135 titled “An act making ax>propriations for the service of the Post-Office Department for the fiscal year ending June 30, 1877, and for other puposes,” approved July 12, 1876.
At the term of court following that in which judgment was entered in the case of the Chicago, Milwaukee and Saint Paul Eailway Company the case of the Chicago and Northwestern Eailway Company was heard and decided. (15 C. Cls. R., 232.)
The contract in that case was for the transportation of the mails for four years from July 1,1875, and contained a clause in every respect identical with provision 9 in the other contract.
The Government claimed to apply to this contract the provisions of the Act of June 17, 1878, as well as those of section 1 of the Act of July 12, 1876. It also appeared that a part of the claimants’ road was a land-grant road. The Government further contended that the contract was subject to the provisions of the-thirteenth section of the Act of July 12,1876.
This court reaffirmed the doctrines expressed in the previous case, and applied them to the Act of June 17,1878. Assuming this view to be correct, it necessarily followed that it was immaterial whether the terminable contract was made with a land-grant road or a non-land-grant road. In our opinion it was equally terminable and equally terminated in either case.
It was not necessary to go beyond this; but we did, and we held that the statute, codified in sections 3942 and 3946 of the Eevised Statutes, “which authorizes the Postmaster-General to make mail transportation contracts generally for periods of four years, does not operate to relieve the land-grant roads from the terms and conditions of their antecedent grants.”
It seemed to us too clear for argument that when Congress, in 1872, as part of a general statute “ to revise, consolidate, and amend the statutes relating to the Post-Office Department” (17 Stat. L., 283), enacted that “no contract for carrying the mail shall be made for a longer term than four years” (17 Stat. L., 315, § 256), and that “the Postmaster-General may enter into contracts for carrying the mail for railway companies without advertising” (17 Stat. L., 316, § 265); and when it consolidated these enactments into the sections of the Eevised Statutes already quoted, it had no pmpose of surrendering the power to fix rates for mail transportation which it had reserved to itself as a condition of the valuable grants which it had made to the land-grant roads. It seemed to us that the true rule of *136 construction to be adopted was tbe one laid down by tbis court in Wilcox's Case (12 C. Cls. R., 495), and textually adopted by tbe Supreme Court in tbe same case (95 U. S. R., 664), that—
no construction should he accepted which would defeat the clearly established policy of Congress, by giving substantial force to language not material to the subject-matter legislated upon, and by establishing an incidental and accidental change of the law beyond the contemplation of the legislators.
We bad no doubt that it was not the purpose of tbe individual legislators who voted for tbe Act of 1872, and therefore could not be taken to be tbe will of tbe aggregate body, that Congress by those sections was surrendering its reserved power. It seemed to us that there was enough for tbe act to operate on without giving it that construction. But tbe Supreme Court thought otherwise. It said—
the contract was an exercise of the reserved power, with an added obligation not to exercise it otherwise for the period agreed on.
This court was further of tbe opinion that there was no inequity in terminating tbis terminable contract; in tbe resumption by Congress of its suspended power; and in calling upon companies which bad voluntarily assumed the duty of transporting tbe mails at prices fixed by Congress to comply with tbe terms upon which they had accepted tbe benefits conferred upon them. Tbe Supreme Court held us in error in tbis respect. It said:
When Congress authorized the Postmaster-General to fix the pvioe by contract within specified maximum rates, and for a period of four years, it was an agreement on the part of the United States that the stipulated compensation should not be withheld during that x>ori.od, which it could not refuse to perform without a breach of the public faith.
Two other questions arose in tbis case which bad not arisen in tbe other case.
In the first place, tbe Chicago and Northwestern Company bad protested against tbe reduction, while tbe other company had made no protest. Tbis court said of tbis that tbe Postmaster-General bad no discretion to bind Congress and that a notice by protest to him in face of tbe statute was not notice that could operate in favor of tbe claimants or bind the Government. Tbe Supreme Court said that tbe Postmaster-General’s construction of tbe law was erroneous, and it made no diffierence whether tbe company bad protested against it or not.
In tbe next place tbe contract was not a simple contract for *137 tbe transportation of tlie mails. It was a contract for transporting them in a particular manner — in special cars, lighted and warmed, and fitted so as to accommodate traveling postal agents, according to tbe provisions of section 4002 of tbe Ee-vised Statutes.
Tbis court was of opinion that while a land-grant road bad undertaken as tbe condition of tbe grant to transport mails at prices fixed by Congress, it bad not undertaken to perform tbe other special service. We thought that such companies were as free to make or refuse to make such contracts as tbe non-land-grant railroad companies are. And bolding, as we did, that tbe contract was terminable, and that it was abrogated by tbe statutory notice, we further held, as we bad held in tbe other case, that tbe continuance to perform tbe service after the notice operated as an acceptance of tbe terms for a new contract offered by Congress. But tbe Supreme Court, if we rightly understand its language, says we are wrong in think.ing that land-grant roads are not required to transport mails in tbe manner calléd for by section 4002. It says that tbe company u was bound by its contract to perform tbe service, and its performance was demanded.” It is not to be supposed that tbe highest court intends to assert that tbe United States could insist upon tbe performance of tbe contract sued upon at a less rate of compensation than tbe Postmaster-G-eneral bad agreed to pay. It must therefore be taken that tbe contract referred to in tbe opinion of that court was tbe contract in tbe condition attached to tbe land grant; and that tbe service referred to was tbe special service provided for by tbe written contract.
Tbis careful review constrains us to tbe opinion that tbe points suggested by tbe Postmaster-General must have been considered by tbe Supreme Court. It is tbe prerogative of that court to control tbe will of subordinate Federal courts.
Tbe judgment of tbe court is that the claimants have and recover of tbe defendants tbe sum of $139,080.05.
Duaiie, O. J., was absent when tbis cause was beard, and took no part in tbe decision.