Loring, J.,
delivered the opinion of the Court.
In this case the petitioner claims balances of accounts which he alleges to be due to him on contracts for the construction of mortar-boats and steam-tug boats, made with him on the part of the United States by Major General Frémont, while in command of the military department of the west; and he counts on the special contracts above referred to, and on a quantum meruit for labor and materials in furnishing the boats.
*80 We find tbe facts to be: •
1st. That on tbe 17tb of June, 1861, tbe quartermaster’s department issued proposals for constructing gunboats on tbe western rivers, which stated that specifications would be prepared, and that “plans submitted by builders will be taken into consideration.”
2d. That in July, 1861, tbe petitioner submitted to the Quartermaster General a plan and specification for tbe construction of mortar-boats, to be used upon tbe western rivers, together with a detailed estimate of their cost, and a proposal to construct them.
3d. That tbe quartermaster’s department, under its proposals for gunboats above referred to, contracted with James B. Eades for seven gunboats, which, with three others then afloat, would consume, it was believed, very nearly tbe whole, if not tbe whole appropriation then made, and applicable to tbe purpose.
4th. That tbe plan and specifications for mortar-boats above mentioned were examined at Washington by tbe Quartermaster General, tbe Assistant Secretary of tbe Navy, and Major General Frémont, and tbe proposal of Mr. Adams to construct them was considered, but not adopted by tbe quartermaster’s department. And the subject was referred by tbe Quartermaster General to General Fremont, as be was to have tbe command of tbe military operations on tbe Mississippi, and if be thought these mortar-boats would be useful, be could communicate to tbe War Department, and take such action as might be decided upon.
5th. That on tbe 31st July, 1861, the Secretary of Wai’, by an order addressed to Knapp, Rudd & Company, at Pittsburg, directed that sixteen nine-inch guns made for tbe navy should be forwarded with tbe greatest despatch to Major General Frémont, at St. Louis; and that thirty thirteen-inch mortars be made as soon as possible and forwarded to tbe same address, together with shells for both guns and mortars.
6th. That on tbe 24th of August, 1861, tbe petitioner submitted bis plans and proposals for mortar-boats to Major General Frémont, by bis direction, and offered to build tbe same for eight thousand two hundred and fifty dollars each, with iron sides, which General Frémont bad suggested; and if tbe ironed sides were dispensed with, for five thousand two hundred and fifty dollars each.
7th. That Major General Frémont accepted tbe first proposal of tbe petitioner, and directed tbe petitioner to proceed with all possible de-spatch to construct thirty-eight of said mortar-boats, with ironed sides, as described in said plan and specifications, for the sum of eight thousand two hundred and fifty dollars each, and reserved to himself tbe *81 right to increase or diminish the number of said boats according to his judgment of the number required; and directed that Quartermaster McKinstry should have executed a formal contract in writing. Quartermaster McKinstry referred the execution of said formal contract to Captain Turnley, assistant quartermaster. The contract was written, and was signed by the petitioner, but it was not signed by Captain Turnley on the part of the United States.
8th. That the petitioner, under the proposals, acceptance, and contract aforesaid, proceeded to build and completed the said thirty-eight mortar-boats. And on the 20th day of November, 1861, Assistant Quartermaster Turnley requested flag-officer Captain Foote of the navy to direct competent officers to inspect the boats built by the petitioner, and report thereon in reference to his payment. And thereafter the Quartermaster General, on learning the completion of said boats, and that there was some difficulty about them, ordered Major Allen of the quartermaster’s department to have the mortar-boats sent down the river to receive their guns; and this was done.
9th. That on the 10th of September, 1861, General Fremont, on the part of the United States, contracted with the petitioner for four tug steamboats, to be built according to specifications set forth in a written contract therefor, and each for the sum of twenty-five hundred dollars, payable on delivery, and after inspection. And the said vessels were to be completed within thirty days, under a forfeiture by the petitioner of fifty dollars for each day’s delay on each boat, to be paid to the United States as liquidated damages. And it was ordered by General Fremont that said contract should be signed by Major Allen of the quartermaster’s department, for and in behalf of the United States, The contract was signed by the petitioner, but was not signed by Major Allen.
10th. That on the fifteenth day of September, 1861, General Fré-mont, on the part of the United States, made a second contract with the petitioner for four additional steam-tug boats, to be built by the petitioner for the same price and on the same terms and conditions as the four steam-tug' boats first contracted for, as above set forth. And General Frémont ordered that said second contract should be signed by Major Allen, for and in behalf of the United States. The contract was signed by the petitioner, but was not signed by Major Allen.
11th. That on the twentieth day of September, 1861, General Fré-mont, on the part of the United States, contracted with the petitioner that he should build cabins and pilot-houses, and put steering wheels *82 and apparatus and windlasses on said eight steam-tug boats, and do all the necessary painting on them, and all the work necessary to put them in condition for sailing, for the sum of eighteen hundred dollars for each boat; the said eight cabins to be completed as soon as the engine work was done, or within five days thereafter. And General Frémont ordered that said Major Allen should sign said contract, for and in behalf of the United States. The contract was signed by the petitioner, but was not signed by Major Allen.
12th. That under the contracts aforesaid, the petitioner proceeded to build the eight steam-tug boats, and their cabins, pilot-houses, &c., and completed the same according to said contracts; and the boats thus completed having been duly inspected and approved, were received by the officers of the quartermaster’s department in the army commanded by General Frémont. The said eight tug-boats were for the purpose of moving and towing the mortar-boats, and were adjuncts thereto and part of the petitioner’s original plan therefor.
13th. That on the tenth day of December, 1861, the Secretary of War made to Congress the following communication:
WAR DEPARTMENT,
December 10, 1861.
Sir : I have the honor to submit herewith the report of the Quartermaster General to this department, setting forth the necessity of an early provision to meet the expense of constructing the armed flotilla on the western rivers, and respectfully invite the attention of Congress thereto.
I am, very respectfully,
SIMON CAMERON,

Secretary of War.

Hon. the Speaker of the House of Representatives.
Quartermaster General’s Office,
Washington City, December 5, 1861.
Sir : I respectfully call your attention to the propriety of early provision to meet the expense of constructing the armed flotilla on the western rivers.
Under the appropriations, amounting to $1,100,000, for gunboats on the western rivers, made by Congress at its last session, I was directed to contract for seven gunboats. The plans of these vessels had been prepared by a naval constructor, specially assigned to that duty by the Navy Department. Proposals were invited by advertisement, and it was concluded that the building, equipment, and maintenance of seven *83 of these boats, with payment for three other gunboats, then in service, would exhaust the appropriation.
The general commanding the department of the west ordered, at St. Louis, the construction of a fleet of mortar-boats, and of several tug-boats to be used with them, and the purchase and alteration into gunboats of two river steamers, the New Era, and the Submarine. All these were ordered by him in addition to those provided for by the quartermaster’s department.
Under his orders, some money remitted to the quartermaster at St. Louis for other purposes has been paid upon the contracts for this flotilla.
The officers of the quartermaster’s department who have expended this money were bound by the orders of the general commanding in the department, and should be protected from pecuniary liability incurred in the execution of those orders.
While I am not called upon to express an opinion as to the necessity for the construction of so large a flotilla, I have no doubt that the government is bound to pay the contractors their reasonable expenditures; and I have no doubt that if armed and equipped, and well manned, the vessels will add to the strength of the army in the west, and conduce to the success of the expedition intended to open the Mississippi.
In the annual estimate from this office is au item of $1,000,000 for gunboats on the western rivers. Its early appropriation would enable the department to complete and pay for the boats under construction, some of which are in danger of being delayed at St. Louis until the interruption of navigation by ice.
It would relieve those who, in good faith, expended their labor and money upon these boats from heavy pecuniary liabilities.
I am, respectfully, your obedient servant,
M. C. MEIGS,

Quartermaster General.

Hon. SimoN CameRon,

Secretary of War.

14th. That by the act of December 24,1851, (e. 5,) Congress appropriated one million of dollars “for gunboats on the western rivers;” (32 Stat. L., 331.)
15th. That in January, 1862, the Secretary of War directed that the said thirty-eight mortar-boats built by the petitioner, and then at Cairo, should be completed for service by getting on board their armament, for which they were then ready, at the earliest date practicable; *84 and this was done, and the mortar-boats and tug-boats were taken into the service of the United States and immediately used in the military operations on the Mississippi river.
16th. That Congress by act of July 16, 1862, (c. 45, 12 Stat. L., 547,) enacted that the western gunboat fleet, constructed by the War Department for operation on the western waters, should be transferred to the Navy Department.
17th. That on the 25th of October, 1861, the Secretary of War, by direction of the President, appointed a board of commissioners “to examine and report upon to the Secretary of War all unsettled claims against the military department of the west that had originated prior to the 14th day of October, 1861.”
18th. That on December 18, 1861, the petitioner presented to said commissioners his claims for said mortar-boats, tug-boats, and cabins, &c., in two accounts, as follows:
[First account.]

The United States to Theodore Adams, Dr.

For building 38 mortar-boats for the United States, as per order of Major General Frémont herewith attached, dated August 24,1861. $313,500 00
Deduct this amount, paid by Major McKinstry on the-
day of-. $75,000
Deduct this amount, paid by Major A. Allen, quartermaster, 7th to 32th November. 55,000
Total to be deducted. 130,000 00
Balance due. 183,500 00
And on this account the commissioners allowed the petitioner.... $75, 959 24
[Second account.]

The United States to Theodore Adams, Dr.

For building 4 hulls for tug-boats for the United States, as per contract herewith, dated September 10, 1861, by Major McKinstry,
quartermaster, at $2,500 each. $10,000 00
For building 4 hulls for tug-boats for the United States, as per contract herewith, by Major McKinstry, quartermaster, dated
September 21, 1861, at $2,500 each. 10,000 00
For building 8 cabins for tug-boats for the United States, as per contract herewith, dated September 20, 1861, by Major McKins-
try, quartermaster, for $1,800 each. 14.400 00
34.400 00
Deduct amount already paid 9,000 00
And on this account the said commissioners, deducting therefrom $5,204 from the charge for tug-boats, allowed the petitioner-$20,196 00
$25,400 00
*85 19fcb. That on his said claims the said petitioner received from the said commissioners vouchers for the said sums of seventy-five thousand nine hundred and fifty-nine dollars and twenty-four cents, and twenty thousand and one hundred and ninety-six dollars, and signed a receipt for said two vouchers in the words following, viz: “ The undersigned acknowledge to have received the vouchers referred to and described below, which, when paid; will be in full of all demands against the United States on account of the respective claims set opposite their several names.” And the petitioner was not allowed by the commissioners to receive said vouchers until he had signed the said reciept; and he protested against such action of the commissioners, and signed the receipt and agreement under said protest.
20th. That Congress by the joint resolution of March 11, 1863, (12 Stat. L., 615) provided as follows:
“ Resoloed by the Senate and House of Representatives of the United States of'America in Congress assembled, That all sums allowed to be due from the United States to individuals, companies, or corporations, by the commission heretofore appointed by the Secretary of War, (for the investigation of military claims against the department of the west,) composed of David Davis, Joseph Holt, and Hugh Campbell, now sitting at St. Louis, Missouri, shall be deemed to be due and payable, and shall be paid by the disbursing officer, either at St. Louis or Washington, in each case, upon the presentation of the voucher, with the commissioners’ certificate thereon, in any form plainly indicating the allowance of the claim and to what amount. This resolution shall apply only to claims and contracts for service, labor, or materials, and for subsistence, clothing, transportation, arms, supplies, and the purchase, hire, and construction of"vessels.”
And the said sums of seventy-five thousand nine hundred and fifty-nine dollars and twenty-four cents, and of twenty thousand one hundred and ninety-six dollars, allowed as aforesaid by said commissioners to the petitioner, were paid to him by the United States under the said resolution.
21st. That the value to be found on a quantum meruit for the said mortar-boats (exclusive of the invention) was $6,547 60, and for the said tug-boats, cabins, &c., $3,200.
And on the facts stated, a majority of the court are of opinion that the petitioner is not barred from maintaining this action by the receipt and agreement signed by him.
And that he is entitled to recover from the United States the balance unpaid on the contracts above set forth, viz: For the mortar-boats, *86 $107,544 76; for tbe tug-boats, cabins, &c., $5,204, amounting to the s'um of $112,748 76, for which judgment is to be entered for the petitioner, and a certificate issued to him.
A majority of the court are of opinion that by the act of December 24, 1861, appropriating one million of dollars to the gunboats on the western rivers, enacted after the communication made to Congress by the Secretary of War, December 10, 1861, submitting the report of the Quartermaster General of December 5,1861, and with a full knowledge of the circumstances and opinions therein set forth, and by the exigency of the important military operations then pending on the Mississippi river, and awaiting the means of execution, the Secretary of War was authorized, without previously advertising, to acquire to the United States the mortar-boats, and the tug-boats, which were in fact a part of the mortar-boats; and that he did this in January, 1862, by ordering that the mortar-boats should be completed, and taking them and the tug-boats into the service of the United States. And that he thereby bound the United States to pay for them, the price specified in the contracts under which they were built, because the boats were delivered to the United States under those contracts, and as the Secretary neither objected to those contracts nor proposed any other, it is to be presumed that he adopted those.
It was contended for the defendants, in the able argument of the assistant solicitor, that the petitioner was barred of his claim by the payment of the money allowed him by the commissioners, and his agreement to receive it in discharge of his whole claim. But that agreement is not shown to have been made between the parties here, who are the United States and the petitioner. The commissioners were not authorized by the United States to require such an agreement, and therefore it was not the act of the United States. The commissioners were merely appointees of the Secretary of War, and their whole authority was to examine and report to him upon the claims submitted to them, and they had no authority to adjudicate or make terms and conditions between the United States and the petitioner. When the petitioner appeared before them he thereby submitted himself to their proper authority, and no other; and he protested against the requirement of the agreement in question. Then the joint resolution of the 11th March, 1862, refers to the commissioners as appointees of the Secretary of War, and thus recognizes their authority as conferred by him, and no other; and it then declares that the amounts allowed by them shall be deemed “due and payable,” and thus recognizes their report for what it was, the evidence from a depart *87 ment like an auditor’s report of a debt shown in that department. But it does not recognize it as a legal judgment, or an adjudication of any sort of its own force binding on the United States, and conclusive of the rights of the parties here. The resolution does not recognize, mention, or refer to the agreement in any way whatever, and there is nothing in the case that shows that Congress ever adopted or sanctioned the agreement. It cannot be presumed that the United States sought to enforce the petitioner to accept less than was his due, or their conclusion as to that, in violation of his right to its judicial determination; and as the action of the commissioners in requiring the agreement transcended their authority and infringed upon the rights of the petitioner, the legal presumption and conclusion is that the government disclaimed it. In Story on Agency, (sec. 320,) the rule is thus stated: “Where a person is clothed with authority as a public agent, it cannot be presumed that the government justify or even excuse his violations of his own proper duty under color of authority.” If that is so, the agreement as between the parties here is not proved, hut it is disproved.
And if the agreement was proved, as stated, it would not support the defence of a compromise or an accord and satisfaction, for it would be nudum pactum and void, for want of a consideration. And it would not support the defence of a release of a doubtful claim, for there is nothing in the case to show or indicate that the claim was doubtful, or that the petitioner so considered it, for the evidence of the contract and of its performance was abundant and attainable, and the debtor-solvent.
And what is proved is, that the commissioners refused the petitioner their voucher unless he signed the agreement, and that he signed it under protest, and because he could get the voucher to which he was entitled in no other way ; and where public officers or agents condition the performance of their duty on terms they have no right to require, it is duress, and the terms are not binding on the party on whom they were thus illegally enforced.