Whaley, Chief Justice,
delivered the opinion of the Court:
This action involves the construction of a contract for the erection of setback levees on the east bank of the Mississippi River at two points known as Fitter and Yalewood. The former was 552 miles below Cairo and the latter 527 miles below Cairo and 93 miles down stream from Black Bayou. Both are situate in the Vicksburg Engineer District and were undertaken after the Jadwin plan for flood control of the Mississippi River in its alluvial valley was adopted by Congress on May 15,1928, 45 Stat. 534, 539.
This plan included the enlargement of existing levees at certain places by increasing the height or size and the construction of new levees at other places along the river. In accordance with the Jadwin plan a preliminary survey was made which included the Yalewood, Fitter, and Hagáman levees.
The Yalewood levee is situate on the east bank of the Mississippi River at a point where the river flowing in a northeasterly direction makes a rather sharp turn to the south and back to a southwesterly direction. From 1909 and later years the defendant spent large sums of money in revetment work along the east bank of the river which was then determined to be an eroding bank at this place.
The Fitter levee is situate on the east bank of the Mississippi River at a point where the river flowing in an easterly *386 direction makes a rather sharp turn to the south and back to a southwesterly direction. At this point also from 1909 and later years the defendant spent large sums of money in revetment work along the east bank of the river which was then determined to be eroding.
The setback levees involved in this suit were both on the left bank and east of the existing levees and were to be tied into the existing levees at each end.
During the Spring of 1929 the Mississippi River had one of its greatest floods and the water was at an extremely high level. The Jadwin plan, as adopted by Congress, contemplated the building of the levees from the upper part of the Mississippi River downward as shown in the preliminary survey in 1928.
On April 4, 1929, in pursuance of this plan, defendant issued an advance notice to prospective bidders advertising projects in which were included the Valewood and Fitter items. On May 17,1929, the United States Engineers’ Office at Vicksburg, Mississippi, issued an invitation for bids to be opened on June 17, 1929, for the Valewood and Fitter new lévees, the work to be completed in sixteen months.
The Valewood Levee extended from station 6628 to 6863+61, consisting of 2,500,000 cubic yards more or less, and the Fitter Levee extended from station 8080 + 40 to 8200+82 consisting of 1,500,000 cubic yards approximately. The material was to be procured from borrow pits to the riverside of the new location.
The plaintiff, having received both the notice of April 4, 1929, and the notification of May 17, 1929, entered its bid. When the bids were opened it was found that plaintiff was the lowest bidder for both the Fitter and the Valewood levees, having offered to do the work for 21 cents per cubic yard on Valewood and 25.75 cents per cubic yard on Fitter. The bids made by the plaintiff were unusually low because it contemplated the use of clamshell dredges with which it had been performing work in California. Clamshell dredges had never been generally used and, in fact, were even believed to be useless in the erection of levees on the Mississippi River heretofore.
*387 Plaintiff stated in its bid that it had “the following equipment available for prosecuting the work: Clamshell dredges with long boom, 10-yd. capacity bucket, dragline excavators. Hydraulic dredges, towboats, barges, and all other equipment necessary” and that this equipment was at that time located at New Orleans, Louisiana. After the bids had been opened plaintiff’s representatives conferred with the defendant at the oifice of the District Engineer and discussed the use of clamshell dredges on levee work.
On June 19, 1929, the plaintiff was informed that its bid would be accepted and by letter on July 3, 1929, received a formal notice from the District Engineer of its acceptance. The contract was enclosed for plaintiff’s signature and there was included in the formal contract a provision to the effect that the contract would have to be approved by the Chief of Engineers of the United States Army and plaintiff was requested to execute the contract.
On July 6,1929, the contract was duly signed by the plaintiff and returned to the District Engineer. On July 15,1929, plaintiff was notified by the District Engineer that the contract had been forwarded to the Chief of Engineers for approval and an early submission of plaintiff’s program of work was requested. The District Engineer also gave notice that “on account of the emergency character of the work” plaintiff would be required to start operations at each levee. Plaintiff notified defendant that it was prepared to proceed with the work as soon as orders were received to commence.
On August 5, 1929, the plaintiff was notified by wire that the contract had been approved on August 2,1929, and work would be required to commence on each levee without delay and plaintiff’s program of operations was again requested. Plaintiff was also notified by letter on the same day to commence work and the completion date of the contract was fixed as December 6,1930, being 16 months from the date of notification.
The contract contained provisions for making monthly payment on estimates of completed work and, at the discretion of the contracting officer, partial payments for incom- *388 píete embankments, and also that continuous lengths of levee of 500 linear feet might be accepted by the contracting officer when completed, the quantities named not to be varied more than 20 percent. The contracting officer was given the power to designate the exact location at which the work was to be prosecuted and, unless otherwise directed by the contracting officer, the embankment was to be started “full out to the slope stakes and be carried regularly up to the gross fill.” All the existing levees were required to be left intact unless the contracting officer directed otherwise.
The contracting officer was the District Engineer of the United States Army Engineer Corps.
In order to use the clamshell dredges the plaintiff on August 7, 1929, requested the contracting officer to modify the borrow-pit specifications to permit dredging to a depth of 12 feet in order to provide sufficient operative flotation for the use of the clamshell dredges. Without this increased depth in the borrow pits the use of the clamshell dredges would have been impracticable.
On August 21, 1929, this modification was made in the following terms:
Starting at 40 feet (edge of berme) from toe of new levee, borrow pits may be deepened on a slope of 1 on -2 down to a depth of 12 feet below natural surface and extending riverward on a level grade to that point where it intersects 1 on 25 pit slope, but the back of the pit shall not be within 350 feet of the center of the existing levee.
All material removed below the specified borrow pit slope of 1 on 25 must be replaced before the front levee is cut down at Fitter and before final payment is made at Yalewood. On both contracts payment for equivalent yardage will be withheld until the borrow pits are restored to specified slopes.
Immediately upon receipt of this permission to increase the depth of the borrow pits, plaintiff proceeded to bring its clamshell dredges from New Orleans to the site of the work.
These dredges were floating equipment and were brought from New Orleans through the channel of the Mississippi Eiver up to a point opposite the site of the work and then *389 had to be brought through or over the bant of the river by flotation channels to old borrow pits alongside the location of the new levees.
In the spring and early summer of 1929 the Mississippi River at the site of the work was higher than its banks but in the early part of July the river had receded to such a degree that the dredges had to cut their way in through the banks.
The plaintiff, on August 7, 1929, requested permission to cut through at certain designated locations, one of which was through existing articulated concrete revetment work, and offered to pay the cost of replacements. The contracting officer refused this request because of the physical circumstances which applied to revetment work and the care which must be exercised where revetments of banks have been made.
These revetments were concrete mats sloped from the shore over the river bank and formed a concrete side to the bank and were used for the purpose of stopping and preventing erosion of the banks. The contracting officer and plaintiff agreed to a different point of departure from the river and entry to the site for the clamshell dredges.
The clamshell dredge Hercules, which had a bucket capacity of 5y2 cubic yards, was the one plaintiff decided to use on the Fitter loop. This dredge departed from New Orleans on August 21 and arrived opposite the site of the work on August 30,1929. From the date of its arrival until December 7,1929, the dredge was taken by locks and dams through river bank and old levee along borrow pits to the site of the new levee in order to be in position to begin dredging on the actual work of the contract.
The process of flotation by which the dredge had to excavate a channel for itself, turning around, damming itself in, and raising the desired water level by pumping, was a slow and tedious operation. Three locks were necessary and the dredge had to raise itself by flotation to a height of about 34 feet. Plaintiff cut below the natural ground surface in making a channel through the old levee instead of making an additional lock.
On the Valewood loop the clamshell dredge Cairo with a 6 cubic yard capacity bucket was used. The dredge arrived *390 opposite the site of the work on September 6, 1929, and the same operation was necessary as that required by the Hercules. Four locks were used and the dredge was raised about 44 feet and reached the site of the work on December 24, 1929. The additional lock at Valewood avoided the necessity of cutting below the natural ground surface of the bank of the river in making a channel through the old levee.
It will be seen that, although plaintiff was notified to commence work on August 2, 1929, actually the dredge did not arrive at the site of the work at Fitler until December 7, 1929, and at Valewood the dredge did not arrive in position for levee operation until December 24, 1929, or a lapse of 127 days in the first instance and 144 days in the second instance.
Although plaintiff sues on many counts and during the hearing of the case a large volume of evidence was introduced and many exhibits filed, a great many of these counts have been abandoned and the plaintiff now, in its brief, confines itself to only certain specific counts which will be taken up separately in order to show clearly in each instance the nature of the claim and to solve the question of liability for the losses alleged.
The claims which are now asserted are the following:
(1) Excess costs paid Canal Construction, Fitler (including items of “slides” and “subsidence”)_$312,312.95
(2) Excess costs paid National Dredging Co. Fitler- 67,923. 69
(3) Excess costs paid Canal, Valewood_ 100,825. 59
(4) Damage for breach, repayments- 27,716.00
(5) Deduction as for liquidated damages_ 2,130. 00
Total_$510,908.23
Plaintiff contends that the delay in getting to the place of operation for the actual building of the levees at both Valewood and Fitler was due to the length of time taken by the Chief of Engineers, U. S. Army, to approve the contract. The approval by the Chief of Engineers was well within the time limit of the contract. Plaintiff signed the contract when it was submitted to it with this provision and it thereby waived any right it may have had to have a standard form of contract which was to be signed only by the contracting officer. Sun Ship Building Company, 76 C. Cls. 154.
*391 It is also contended by the plaintiff that when certain parts of the work were taken away this action was based on the idea that it was an emergency contract for the performance of emergency work. It is true that the geographical location of the work, being miles from the general plan and at strategic points on the river, would have cautioned any experienced engineer that it was in the nature of an emergency. Nevertheless the taking away of a portion of plaintiff’s contract was not based on this reason but solely because of the fact that plaintiff was so far behind its schedule that it would be impossible to finish on the agreed contract completion date.
Plaintiff admits in its brief that during the months of December and January and part of February, owing to the necessity of training the crew, the breaking-in of the equipment, adjustment of methods to meet particular situations, and the weather conditions, it could not and did not make progress at a normal rate. Because of this condition on or about the middle of February 1930 the contracting officer began to complain of the lack of progress.
The plaintiff also contends that it was harassed and annoyed in the progress of its work due to the many conflicting orders issued by the contracting officer. All of these orders were reasonable and provided for in the contract, but it is unnecessary for us to go into the matter in order to disprove plaintiff’s contention because it is admitted by plaintiff’s witnesses that none of these orders was obeyed.
On or about June 14, 1930, the contracting officer recommended to the Chief of Engineers that all or part of the work on both projects be taken away from plaintiff and let to others because of the failure of the plaintiff to make satisfactory progress in the work and it was apparent that plaintiff could not, at the rate it was operating, complete the contract within the time allowed.
The Commissioner who heard the testimony in this case has found, and the Court, after a careful examination of the evidence, has confirmed his finding that the failure of plaintiff to make reasonable progress, so as to complete the work within the contract period, was due to its failure to have sufficient equipment with which to perform the work.
*392 Plaintiff contends that it was forced in June 1930, at a conference in the Chief of Engineers’ Office to supply certain special equipment in order to increase production. Plaintiff agreed to supply the equipment but totally failed to place upon the work the equipment promised at this conference.
The evidence does not disclose any unreasonable acts on the part of the contracting officer which amounted to capriciousness or arbitrariness either in the orders given for the depth of the borrow pits or in the manner in which the material was being placed on the levees.
The plaintiff asked and received permission to dig the borrow pits to a depth of 12 feet during the course of the contract and subsequently the contracting officer, feeling that this depth would cause subsidence and that a depth of 10 feet was sufficient for the flotation of the dredge, revoked this order and required the borrow-pit depth to be no greater than 10 feet. However, plaintiff paid no attention to this order and did not comply with it. As to the orders in reference to the wet material being placed on the levee by the clamshell method, plaintiff paid no attention to them, although there was a provision in the contract that no material having a tendency to slough should be placed in the levees.
Plaintiff also contends that the material which the Government was to furnish at the Fitter levee was loam and not buckshot. An examination of the specifications shows that there is no merit in this contention. Paragraphs No. 1, No. 19,' and No. 38 do not guarantee the material to be loam. Paragraph 1 reads as follows:
1. The work to be done is on the Mississippi River in the States of Mississippi and Louisiana, and consists in building new levee to adopted tentative grade and Class A or B section (paragraph 19).
Paragraph 19 (thus referred to) provides that an A section shall have a crown of 10 feet, a riverside slope of 1 on 3, the landside slope shall contain seepage line of 1 on 6, and the governing material shall be 75% or more buckshot, and that a B section shall have a crown of 10 feet, a river *393 side slope of 1 on 3y2, the landside slope shall contain a seepage line of 1 on 6%, and the governing material shall be loam.
Paragraph 38 states, in part:
38. (a) The work to be done is on the Mississippi River and consists in building new levees at the points indicated below and as shown on Mississippi River Levee Project Sheets Nos. 11 to 13, inclusive, Survey of 1928, to adopted tentative grade and Class A or B section.
The note on the drawing states:
Estimate based upon Class B Material which according to surface information and occasional borings is to be generally found. However, if and where sufficient Class A Material is found available the section will be reduced in conformity thereto, being within the 20% provision of paragraph 12 of the specifications.
Class B material was specified as loam and Class A material was specified as 75 or more percent buckshot. The clear intent and purpose of this notation was to give to the prospective bidders notice that a reduction would be made in the estimated yardage if Class A material were found. There is no guarantee in the note as to what class of material was to be found. Paragraph 19 clearly shows that where Class A material is used the levee has a steeper slope than where Class B material is used and the levee is smaller than the levee built with loam and therefore it was provided that in the use of buckshot material there would be made a reduction.
Under Article 2 of the contract there is a provision that, where the specifications and drawings differ, the specifications govern, and the matter is to be brought immediately to the attention of the contracting officer to be adjusted and, until adjusted, the contractor proceed at his own risk.
Under Article 4 of the contract there is a provision for “Changed conditions” stating that where subsurface or latent conditions are discovered, materially different from those on the drawings or specifications, they must be brought to the attention of the contracting officer before they are disturbed and, if he finds upon investigation that the conditions differ materially from those shown on the drawings or specifica *394 >tions, he shall make such changes, with the consent of the head of the department, as may be necessary. Provision is also made for an increase or decrease in cost and allowances of time for the completion of the contract.
Plaintiff did not call these alleged changed conditions to the attention of the contracting officer and therefore no action was taken under either one of these articles.
In June 1930, plaintiff was so behind in its work that a conference was held in Washington between the parties at which it was agreed that plaintiff should furnish additional equipment as it was shown that at Valewood only 710,000 cubic yards had been placed and there remained 2,165,000 cubic yards to be put in place by the contractor.
At the same conference it was shown that 700,000 yards of material had been placed at Fitter out of a total of 2,375,000, which left a balance of 1,675,000 cubic yards to be placed. This showed that the plaintiff was far behind in its work on which it had been operating for almost a year, and there remained only a period from the middle of June to the 6th of December to complete the work. On July 21, 1930, the plaintiff, having failed to put the equipment upon the work as agreed, and above recited, was notified that under Article 9 of the contract the Government would take over about 520,000 cubic yards on the Valewood work and about 425,000 cubic yards on the Fitter work. Plaintiff was also notified of its being behind its schedule both at Fitter and Valewood and that its equipment was insufficient for completion within the contract time.
On July 22,1930, the contracting officer notified the plaintiff in writing of the termination of plaintiff’s right to proceed on the work between Stations 6750 and 6795 at Valewood and between Stations 8096+26 and 8138+65 at Fitter, and that the Government would complete the work on these sections of the contract and the excess cost over the contract price would be charged to the plaintiff. At the same time the contracting officer gave advance notice to bidders of intention to advertise and relet these sections, and they were accordingly advertised and bids were entertained.
The lowest bidder was the United Dredging Company, which made a bid at the precise prices of plaintiff’s rates in *395 its contract. The next lowest bid was made by the Canal Construction Company which offered to do the work for 40 cents per cubic yard at Yalewood and 56.5 cents per cubic yard at Fitler. The Government rejected the bid of the United Dredging Company because it was an affiliate of plaintiff and controlled by the same interests and had the same officers in charge. The bid of the Canal Construction Company was accepted and a contract was entered into on August 15,1930.
The provisions of the contract with the Canal Construction Company were practically those agreed upon between plaintiff and the Government, but, owing to the methods pursued by the plaintiff in putting wet material in the levees, which caused the contracting officer to believe there would be slides, it was necessary to make a provision in this contract covering any work occasioned by the improper work done by the plaintiff. In other words, the Government simply made provision in this new contract that, if there should occur slides and work which was not properly performed under plaintiff’s contract, this new contract would cover the additional work as well as the actual amount of yardage taken away from the plaintiff.
There is no material difference between the two contracts which would show that the agreement with the second contractor was not the same as that with the first contractor. A provision for slides and faulty work was incorporated in the original contract and plaintiff would have had to perform this work if it had completed the contract and the defects had been discovered during the progress of the work or even after completion.
Plaintiff’s contention that the two contracts varied materially cannot be sustained.
After the reletting of the portion of the work to the Canal Construction Company, the contracting officer made numerous complaints to the plaintiff about the lack of progress of the work left on the original contract and its failure to supply sufficient equipment to complete within the time limit of the contract. The contracting officer demanded sufficient equipment and held conferences relative thereto during the latter part of August and the first part of September. *396 Following these conferences plaintiff agreed to put additional equipment at Fitler in order to fill in the opening where the clamshell dredge had cut through the original levee, and notified the contracting officer that it would sublet a large amount of the yardage on the southern end of clamshell section and also sublet the work on both ends of the levee. This was satisfactory to the contracting officer with the condition that the cut through the controlling levee be restored to the full grade, the shrinkage be provided for and no material be removed from the controlling levee through any subletting.
Plaintiff was unable to get subcontractors with sufficient equipment to carry out this arrangement and began to purchase more equipment and so advised the contracting officer. A conference was held in the latter part of September but the assurances given by the plaintiff were not satisfactory to defendant’s officers as to the progress of the work which had been done or as to the probable progress with the equipment available.
The contracting officer notified plaintiff that the equipment brought onto the job was insufficient and the progress of the work unsatisfactory, and that, under Article 9 of the contract, the work on Sections 8138+65 and 8184+25 excluding the pit refill would be taken away from plaintiff.
The defendant readvertised for bids on the sections thus taken away, including the removing of slides and completion of the levee, and formal notices were issued to prospective bidders on September 25, 1930. The bids were opened on October 4,1930, and award was made to the National Dredging Company at a price of 28 cents per cubic yard, and the contract was signed on October 9, 1930. This contract was substantially the same as that with the plaintiff but with the addition that there was a provision for cutting out and replacing slides which might occur in the work which plaintiff had performed.
At the time this work was taken over, plaintiff was not prosecuting the work with such diligence as to insure its completion within the contract time. Plaintiff used the clamshell dredges in refilling borrow pits and cutting out and replacing slides incurred by its own work. The taking away of these *397 sections of the work left only the end sections of the Fitler new levee on which clamshell dredges could work.
The Canal Construction Company cut away about 20 feet ■of the base of the river side of the embankment which had been placed by the plaintiff in order to form a road bed for its railroad between the levee and the borrow pits, and excavated a ditch for the levee material brought up in the railroad cars so that it could be reached by dragline and brought to the top of the embankment. The riverside part of the Fitler loop constructed by the plaintiff was of relatively dry material and the slides which the Canal Construction Company removed were to the river side of the loop. There is no convincing proof that these slides were due to the material which had been placed in the embankment by the plaintiff.
There has been charged against and collected from the plaintiff by the defendant $109,469.88 for correction of the Fitler slides, being 193,752 cubic yards at the Canal Construction Company’s rate of 56.5 cents per yard. The evidence does not sustain the defendant’s contention that the plaintiff was responsible for the slides, and it is entitled to recover the amount so charged and collected.
In the National Dredging Company contract on the Fitler levee the slides were generally landward. Plaintiff’s method of operation by the clamshell dredge was to remove the dry earth to the length of the boom of the dredge and place it on the riverside section of the levee leaving a dam between the flotation pit and the pit so excavated. After this dry material was so placed, the excavated pit would be flooded by the breaking of the dam and the clamshell dredges would continue the work in the new pit thus flooded. Earth excavated from dry land was placed on the riverside slope of the levee, forming practically a retaining wall, and earth excavated from below the surface of the water was placed on the landside slope of the levee. The latter, being of wet material, large moist lumps of buckshot, was supposed to slide down of its own weight to the toe of the levee. These large lumps did slide of their own weight and would shove other lumps so deposited towards the landward toe but, being of large dimensions and saturated with water, pockets would form which would fill with water. .The lumps were not *398 broken up so as to dry out. The depositing of these large lumps under this method formed surfaces which, when covered up, would not appear to be defective but ultimately would smooth out, slide gradually, and not cohere together. The wet buckshot thus deposited on the landside of the levee would take a great length of time to dry out and when covered up would sometimes not dry out in sufficient time to prevent slides.
The attention of plaintiff was repeatedly called to this condition and it was warned that the method being used of so depositing wet material might cause the lumps to ultimately occasion the slides. Slides did occur because of the placing of the material by the plaintiff under this method. The National Dredging Company was required to cut out and replace these slides, which were solely due to the plaintiff’s operations, and plaintiff was charged the sum of $61,-257.28 for this work, being 218,776 cubic yards placed in the levee embankment at the National Dredging Company’s rate of 28 cents. Defendant was correct in charging against the plaintiff this amount as it was work which plaintiff would have had to correct under its own contract.
On November 24, 1930, there occurred a subsidence of the Filler loop between stations 8100 and 8111. A subsidence is a dropping down or sinking of the levee accompanied by a rising up of another portion of the terrain. Defendant claims that this was due to the overdigging of the borrow pits on the riverside of the levee and the breaking of the restraining overlying strata of buckshot which would have sustained the weight of the levee. However, the Canal Construction Company had taken away a large section of some 20 feet of dry material from the riverside base of the levee. The evidence does not bring conviction that the overdigging of the borrow pits was the real cause of this subsidence.
Underlying the embankment was an ancient cypress swamp consisting of cypress stumps and soil such as quicksand, which, being in a relatively fluid state, transmitted the downward pressure of the levees upward to the riverside berm and the bottom of the pits, causing both berm and bottom of borrow pit to rise. The borrow pits alongside the subsidence had been partially refilled before the subsidence *399 took place and the natural berm left by plaintiff was much wider than the minimum carried in the specifications. There is no question that there was overdigging in the borrow pits. The evidence is inconclusive that it was uniform but shows that the overdigging was sporadic. The proof does not bring conviction that this subsidence would not have occurred had the borrow pits not been overdug sporadically. The history of levee construction on the Mississippi River shows that sub-sidences have occurred when there has been no overdigging..
Correction of this condition was made by the Canal Construction Company and charged by the defendant against the plaintiff in the sum of $61,651.52. Plaintiff is not liable: for this entire amount but is entitled to recover that sum less the excess cost of placing 15,147 cubic yards in the levee embankment, which was part of its contract, or the sum of $56,993.81.
Although the contract provided for a completion date on December 6, 1930, plaintiff did not finish the portions which were left to it for completion on the Fitter loop until February 12,1931. The portions left to plaintiff on the Valewood loop were not finished until March 12,1931.
There was charged against plaintiff liquidated damages-under Article 9 of the contract for failure to complete the-work in time, which was entirely due to plaintiff’s failure to provide sufficient equipment, its delay in getting the clam-shell dredges at the site of the work, and the method which it pursued in performing the work which occasioned slides.There can be no recovery on this item. Henry A. Wise, Trustee in Bankruptcy of Ambrose B. Standvard v. The United States, 52 C. Cls. 400.
Plaintiff also claims damages for breach of contract and seeks interest of $27,716.00 because of failure of the contracting officer to allow partial payments which caused plaintiff' to borrow large sums of money in order to perform the contract. In each instance where partial payments were-denied, the contracting officer was simply exercising his discretion in not making payments because of the method pursued by plaintiff in the performance of the work and its failure to complete any sections under the terms of the contract- *400 which would entitle it to partial payments. Furthermore, in dorm, the claim is for damages but in substance it is for interest. None of the cases cited by plaintiff is apposite. In the case of Myerle, Exr. v. United States, 33 C. Cls. 1, 25, this court held:
As to the interest on borrowed money: The delay forced the contractor to borrow money to carry on his contract; for this he was forced to pay interest, an extra expense. The recovery of this sum in this court is forbidden by statute; whether it be claimed in the guise of a damage caused by delay, or in some other form, it remains in fact a claim for interest, and such a claim we are prohibited from allowing (Rev. Stat., 1091). The distinction by plaintiff sought to be made, is one of terms only, not of substance. If plaintiff had used his own money and so lost the interest which it might have earned for him, the claim would have been as meritorious, but would not have differed in principle from that now made.
After the work had been completed and accepted certain slides occurred which defendant claims were due to faulty work on the part of the plaintiff and a counterclaim, for the purpose of collecting the amount which it cost to have these slides corrected, has been interposed. The evidence does not carry conviction that these slides were due to the work of the plaintiff and the counterclaim is therefore dismissed.
We have discussed this case tediously at length because of the large record, the great number of exhibits and the length of time taken to try the case. ■
Plaintiff is entitled to recover the following items:
Correction of slides--— $109, 469. 88 (Finding No. 20.)
Correction of subsidence- 56, 998. 81 (Finding No. 23.)
$166, 463. 69
Judgment will be entered for the plaintiff in the amount of $166,463.69. It is. so ordered.
Williams, Judge; Littleton, Judge; and Green, Judge-, concur.
Whitaker, Judge, took no part in the decision of this case.