Davis, J.,
delivered tbe opinion of tbe court:
Plaintiff’s intestate made with tbe Government two contracts in- relation to' tbe monitor Monadnock; these contracts provided for building the framework and bull and for all ironwork except the armor. It was in the first contract provided, substantially, that tbe Government should furnish the plans and specifications and deliver all materials, freight paid, at Vallejo, Oak, where tbe vessel was to be built.
Tbe second contract was for tbe ironwork (except armor), and construction thereunder was to be begun so soon as tbe first contract bad been completed; to be finished within nine months, there being a penalty for delay. Tbis second contract is not important to tbis action.
*20 Work on the vessel should have been finished by November, 1876. Through delays caused by defendants this became impossible; plans and specifications were not promptly furnished to the contractor, were often changed, and were often defective, all of which involved delay in the vessel and expense to the contractor; while materials were delayed in delivery, were often delivered out of regular order, and were delivered in such defective form as to' make alteration necessary, always at expense to the contractor.
In July, 1876, the Department of the Navy ordered all work on the vessel suspended until further order; this suspension was indefinite as to time, therefore the contractor felt himself obliged to remain in readiness to go on with the work when called upon, and did not deem it wise to disperse his force of trained and skilled mechanics.
In December, 1876, work was resumed and proceeded (with interruptions and delays, all caused by defendants) for about a year, when it was again stopped because of defendants’ failure to deliver materials as in duty bound. The contractor could not again proceed until May, 1883, and the work was not finished until the following November, more than seven years after the date first contemplaied by the parties.
There does not appear in the findings of fact anything tending to show neglect or default upon the part of the contractor; on the contrary, the very unusual delay was due to the defendants’ fault alone and was caused, as appears, by lack of money in the Navy Department.
As early as November, 1878, this claim was presented to the Department of the Navy, where it was held under consideration until February 17,1885, when the Secretary of the Navy referred the case to this court under section 1063 of the Eevised Statutes.
It is urged by defendants that the claims for damage under the contract of October 21, 1875, are barred by virtue of the limitation prescribed by section 1069 of the Eevised Statutes, unless the Secretary of the Navy had authority to refer them, as he did, under section 1063 of the Eevised Statutes; that section 1063 does not contemplate the reference of claims for unliquidated damages, but only of such claims as are within the jurisdiction of the Executive Department to settle; .that claims for unliquidated damage not being within that jurisdiction this claim yas not presented to a competent tribunal *21 within six years from the date when it accrued. The work upon the vessel required of plaintiff’s testator was not entirely completed until 1883, but the cause of several items of claim herein occurred more than six years before the petition was filed in this court, and it is contended that the statute of limitations bars those items.
If this contention by defendants be correct, then any contractor with the Government must, to protect his right, sue upon every item of difference of fact and every item of difference of interpretation of the contract as each detail of his work is undertaken or completed, as the case may be.
There is no more complicated engine known than a completed vessel of war with its massive hull and.armor, its many varied and ingenious engines, its guns with their ammunition and appliances, and its provision for comfortably lodging and feeding a large body of men under all the possible conditions of weather and combat. In the construction of such a vessel it would be strange if there were not daily presented matters of detail involving dispute between the inspecting officer and the contractor, and requiring an immediate, final, and, indeed, arbitrary decision of points of detail as to which difference of opinion may well exist. If each' time such a point arises and is decided adversely to the contractor he must forthwith begin the prosecution of his remedy against the Government, the parties as well as the courts would be subject to great and unnecessary labor and expense in adjusting petty differences, which could more economically and advantageously be settled in a single action brought after completion of the work. Further than this, if an action be brought before all items of damage have occurred damages thereafter happening in the prosecution of the same work under the same contract would be held barred. The work in this case was in fact not completed until more thaii seven years after the contract period, and this not by reason of any fault of the contractor; for most of the time he was held in anxious readiness to proceed, being ignorant of the moment when an order to complete the vessel might be received. The contractor was not lacking in diligence, and if, under these circumstances, defendants’ argument as to the statute of limitations be correct great hardship to the contractor will result.
The claim was presented to the Secretary of the Navy in November, 1878, and afterwards was referred to this court. *22 The Secretary bad jurisdiction to settle tbe amounts due under these contracts and the claim made for extra expenses and work agreed upon and incurred because of defendants’ action and of which defendants have received the benefit. Possibly, because of Government’s repeated and long-continued, delays, plaintiff might have elected to terminate his contract, but he was not forced to do so, as he was guiltless of fault or neglect in the matter and was free to go on, finish the work; and then sue.
We hold that Burgess had a right to wait until his contract was completed; that he was not forced to sue in 1877 and thus risk greater loss, aud that the .right of action herein became complete as to the items herein allowed when the work was finished, to wit, in 1883. This being so, and the claim having been presented to the Navy Department in 1878 and filed in this court April 10,1886, the action is not barred by the statute of limitations. (Dubois v. Del. and H. Canal, 4 Wend., 285; Allamon v. The Mayor, etc,, 43 Barbour, 33; Bendemagle v. Cooks, 19 Wend., 207; Badger v. Libcombe, 15 Pick., 409.)
When a department transmits a case to this court involving controverted questions of fact and law arising upon a claim under a contract which the department might have settled, and on the trial claims for unliquidated damages on either side which the department had no authority to settle are set up, this court may adjudicate upon all such claims the same as though they had been presented here on voluntary petition.
Was there a contract? In this case there was an advertisement aud Burgess was the lowest bidder. The contract was made in accordance with the then policy of the Government under which new vessels were constructed from the general appropriation for the Bureau of Construction and Bepair, and not, as now, under statutes explicitly authorizing the construction of vessels of specified classes. This practice was continued for several years, was public, and was known to Congress, and through appropriations was approved by that body. The course of Congress in relation to the contracts of which Burgess’s was one is indicated by the following citations:
June 6, 1874, general appropriation for 1875 of $3,300,000 for the Bureau of Construction and Bepair. (18 Stat. L., 53, 57.) June 23,1874 (18 Stat. L., 226), statute authorizing the Secretary of the Navy to use the balance of appropriations “ heretofore made to the Navy Department for the construction *23 of a floating iron dock remaining unexpended for tbe purpose of completing tbe repairs on suob double-turreted monitors as tbe Secretary of the Navy may deem necessary for tbe public service.” January 18,1875 (18 Stat. L., 296), general approinflation of $3,300,000 for tbe Bureau of Construction and Repair was made. July 12,1875, proposals for tbe repair of tbe Monadnock were invited, and this fact was made known to Congress. (Appendix, p. 50, Ex. F., Rep. 787, 45 Cong., 2d sess.) Tbe general facts as to this vessel and others in course of construction or repair at tbe same time were from time to time reported to Congress, and very considerable appropriations for tbe Bureau of Construction and Repair were thereupon made by tbe Congress, with full knowledge of tbe facts as to tbe Monadnock, tbe Terror, and other vessels then being-built from these appropriations, but without more specific statutory authority. (Report 787, H. R., 45 Cong., 2d sess., vol. 4; Rep. Com., 2d sess., 45 Cong., 1877-78; act June 14, 1878 (20 Stat. L., 123); House Res. of December 10,1878, as to tbe delay in building Monadnock and damages, etc.) January 20, 1879, Report Secretary of tbe Navy. February 21, 1879, Report 112, H. R., 45 Cong., 3d sess. January 23,1880, report of tbe Secretary of tbe Navy to tbe Committee on Naval Affairs showing bow much was needed to complete the Monadnock, and which contains this statement: “So far as tbe Department is aware, the contractors for all tbe double-turreted monitors named in the bill have thus far executed their contracts as required by law.” (On tbe subject of legislative recognition, see Fremont's Case, 2 C. Cls. R., 1; Riley's Case, 1 C. Cls. R., 299; Adams’s Case, 2 C. Cls. R., 70; Behan’s Case, 110 U. S., 338.) Later (April 2, 1880, 21 Stat. L., p. 303), Congress authorized tbe Secretary to organize a board to examine tbe monitors for tbe purpose of determining whether tbe G-oveminent should finish them. This board reported that tbe vessels should be completed (the plans to be somewhat modified), and tbe Secretary of tbe Navy so informed tbe Congress. (Ex. Doc. 82, Parts I, II, and III, H. R., 46 Cong., 2d sess.) In December, 1881, tbe Secretary of tbe Navy reported to Congress that expense was continually accruing on tbe Monadnock and Burgess was suffering hardship. August 5,1882, followed tbe statute (22 Stat. L., 284,291,293) providing for a naval advisory board, appropriating $400,000 for building and fitting up tbe turret and pilot bouse of tbe Miantonomob, and for launch *24 ing the Monadnock. December 1, 1882, the Greer Board was appointed, as appears in the petition. In his annual report (1882) the Secretary of the Navy (vol. 1, p. 23) states that he has been authorized by Congress to finish the ironclads, and that he has made contracts with the various contractors to furnish the balance of materials and to provide for the launching of the boats, these contracts having been made “ without prejudice to any existing rights of either the Government or the contractors.” On March 3,1883 (22 Stat. L., 472,477), the Navy appropriation act authorized the Secretary of the Navy to take possession of the double-turreted ironclads, to remove them to the Government yards if he should think best, and to ascertain the amounts which should be paid the contractors severally for the use and occupation of their yards and for the care of the ships. February 14,1883, the Greer Board reported to the Secretary, recommending as a payment to Burgess the sum of $192,430.56, and stating that there were monthly damages accruing amounting to $1,116.11. January 7,1884, the Chief of Bureau reported that there was due Burgess Of the contract price $12,190, or if he should be charged with the amount received when freight was. refunded, then the balance would be $4,051.98. February 12, 1S84, the Secretary of the Navy reported as to this board and recommended certain payments to the builders of the Puritan, Am-phitrite, and Terror for the use of their yards, and these recommendations were adopted by Congress (23 Stat. L., p. 459). Congress later (August 3,1886,24 Stat. L., p. 215) authorized the President to complete the double-turreted monitors, of which the Monadnock was one, at a total fixed cost. March 3,1887 (24 Stat. L., p. 594), appropriation was made toward the “construction and completion” (exclusive of armament) of the five double-turreted monitors and the four vessels authorized by the act of March 3,1885, and the vessels authorized by the act of August 3,1886.
From all this it appears that the contract, whether authorized in its inception or not, has been brought repeatedly to the attention of the Congress; that it has been recognized by the Congress as binding on the United States; that that body has authorized payments to' be made upon the contract, and the Navy Department has made payments upon it. The work was done under whatever authority the Secretary of the Navy *25 bad; Congress was folly cognizant of tbe facts and ratified tbe Secretary’s course; tbe contractor honestly.and diligently, at a loss to himself and in tbe face of bardshij), competently completed bis work, and the Government has tbe vessel, which is an important part of tbe naval defense of tbe United States. Tbe contract, we bold, was made by competent authority and was binding upon the parties.
. Tbe service performed by this contractor was under general appropriations covering several vessels; be was not, therefore, chargeable with knowledge as to the Secretary’s apportionment of tbe appropriation between him and other contractors for other vessels built from the same fund. It has been heretofore decided that persons contracting with the Government for partial service under general appropriations are not bound to know the condition of the appropriation account at the Treasury or on the contract book of the Department. (Dougherty v. The United States, 18 C. Cls. R., p. 496. See also upon this point Trenton Company’s Case, 12 C. Cls. R., 147; McCollum’s Case, 17 C. Cls. R., 92; Shipman’s Case, 18 C. Cls. R., 138; Illinois Cent. R. R., 18 C. Cls. R., 118; Chicago and N. W. R. R. Co., 104 U. S., 680; N. Y C. and H. R. R. R., 21 C. Cls. R., 468.)
This case can not follow those of McKay et a.l. (27 C. Cls. R., p. 422), for those cases came to this court under special acts containing provisions peculiar to them as to the measure of damage, whereas this cause must be determined by the general rules of law.
As to the interest on borrowed money: The delay forced the contractor to borrow money to carry on his contract; for this' he was forced to pay interest, an extra expense. The recovery of this sum in this court is forbidden by statute: whether it be claimed in the guise of a damage caused by delay, or in some other form, it remains in fact a claim for interest, and such a claim we are prohibited from allowing. (Rev. Stat., § 1091). The distinction by plaintiff sought to be made, is one of terms only, not of substance. If plaintiff had used his own money and so lost the interest which it might have earned for him, the claim would have been as meritorious, but would not have differed in principle from that now made.
' In Fox and Another v. Harding and Another (7 Cush., p. 516), the court said (upon the question of damages): “The rule has not been uniform or very clearly settled as to the right of a *26 party to claim a loss of profits as a part of the damages for breach of a special contract. But we think there is a distinction by which all questions of this sort can be easily tested. If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. These are part and parcel of the contract itself, and must have been in the contemplation of the parties when the agreement was entered into. But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.” The court add that in the case then at bar jdaintiff's would be entitled to recover such sum in damages “as they would have realized in profits if the contract had been fully performed. To ascertain this it would be necessary to estimate the cost and expense of work and materials in completing the contract on their part, and to deduct this sum from the contract price. The balance would be the profit which would have accrued to them out of the contract itself if it had been fulfilled, and which they have a right to recover, in addition to such further sum as would compensate them for the labor and materials supplied toward the completion of the contract;” and the court add that if plaintiffs had offered to prove that in consequence of the breach of the contract they lost other profitable contracts which they had entered into for the purpose of fulfilling the contract then in suit, such evidence would have been inadmissible.
In Sutherland on Damages (p. 106) it is said: “In another class of cases the question of the certainty of damages is more distinctly involved. * * * The plaintiff’s right to recover for such a loss depends on his proving with sufficient certainty that such advantages would have resulted, and therefore that the act complained of prevented them.” (See also Taylor v. Maguire,12 Missouri, p. 313.) In Blanchard v. My (21 Wendell, p. 342) the Supreme Court of New York thus approves the rule of the civil law, as stated by Pothier: “In general, the parties are deemed to have contemplated only the damages and inter *27 est which the creditor might suffer from the nonperformance of the obligation in respect to the particular thing which is- the object of it, and not such as may have been accidentally occasioned, thereby in respect to his own affairs.” In Walker et al. v. Ellis et al. (1 Sneed, p. 515) the rule is thus stated by the Supreme Court of Tennessee: “In actions of contract, generally speaking, the damages are limited to the natural and proximate consequences of the breach complained of, and the damages remotely or consequentially resulting therefrom, or merely speculative damages, can not be claimed.” In the same State the Supreme Court (following Blanchard v. Ely, 1 Wend., 346) held (in action for breach of agreement to deliver castings) that plaintiff was not entitled to damages lor delay in business caused by the nondelivery, nor for expenses incurred in attempting to procure the castings, nor for speculative profits. Again (in Shaw v. Turnpike Co., 3 Penn., 445), it was decided that, while a party may have the right to declare the contract at an end, if he elects to treat it as still subsisting, “he thereby waives the consequences of such default, and can not afterwards allege the recission of the contract by the defendant and recover on a quantum meruit.”
We hold that the plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. What those items are is somewhat difficult to determine. For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause ana the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably. The damage must be such as ivas to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events; but eliminated from this consideration must be any condition of affairs peculiar to the contractor individually in the particular case and not of general application under similar conditions. There must not be two steps between cause and damage. We have followed this rule in the decision'as to the different items of claim shown in the Conclusion of Law.
On the whole case, judgment for plaintiff in the sum of $129,811.45.