**CALIFORNIA FEDERAL BANK,**
**A Federal Savings Bank,**
**Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 92–138C.**

United States Court of Federal Claims.

Dec. 17, 2002.

John C. Millian, Gibson, Dunn & Crutcher LLP, Washington, D.C., for plaintiff. Mark A. Perry, Paul Blankenstein, Robert C. Blume, Gibson, Dunn & Crutcher LLP, Washington, D.C., of counsel. Caryl A. Potter, Sonnenschein Nath & Rosenthal, Washington, D.C., of counsel. Gary L. Leshko, Cozen O'Connor, New York City, of counsel.

Lee M. Straus, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Tarek Sawi, Delfa Castillo, John Hoffman, Joanne Johnson, and John Kane, of counsel.

## OPINION

HODGES, Judge.

This case is on remand from the United States Court of Appeals for the Federal Circuit. *See California Fed. Bank, FSB v. United States,* 245 F.3d 1342 (Fed.Cir.2001). The Government breached its contract with CalFed to treat supervisory goodwill as regulatory capital and to amortize its goodwill over a period of thirty years. *California Fed. Bank v. United States,* 39 Fed.Cl. 753 (1997), *aff'd,* 245 F.3d 1342 (Fed.Cir.2001). The issue on remand is whether this breach entitles plaintiff to expectancy damages in the form of lost profits. CalFed did not prove causation, foreseeability, or reasonable certainty of damages at trial.[1] Its lost profits model was not credible.

---

1. *See, e.g., Energy Capital Corp. v. United States,* 47 Fed.Cl. 382 (2000), *aff'd in part, rev'd in part,*

### 1. Causation

Defendant's breach did not cause measurable damages to plaintiff. If loss of supervisory goodwill forced plaintiff to "shrink the bank" to improve its capital ratios, or to raise capital, the bank was not harmed by the process.[2] Plaintiff improved its tangible capital position because it phased out supervisory goodwill.

### 2. Foreseeability

The Government promised plaintiff that it could count goodwill as regulatory capital but not that the bank would produce profits as a result. A severe real estate recession in California caused plaintiff financial problems after the breach. Defendant could not have foreseen the recession or its effects when it entered the contract with CalFed, and it could not have foreseen that years later plaintiff would choose to sell assets that it now claims would have been profitable.

### 3. Reasonable Certainty

Plaintiff did not show that the bank's sale of assets such as California Thrift and Loan (CTL) or its adjustable rate mortgages (ARMs) were related to defendant's breach. CalFed's chief executive officer wanted to sell CTL because it was an automobile finance company that did not fit into his "back to basics strategy." The bank sold adjustable rate mortgages because selling loans was a profitable business in which it had a competitive advantage.

## I. BACKGROUND

Congress created the Federal Deposit Insurance Corporation and the Federal Savings and Loan Insurance Corporation in 1933 and 1934, respectively. The purpose of these agencies was to insure qualified deposits in banks and savings and loans. The FSLIC paid billions of dollars to depositors of failed savings and loans during the 1980's. The agency charged higher insurance premiums to recover from insolvency and to replenish the Fund. Many savings and loans associations tried to leave FSLIC and join FDIC for

that reason. Congress tried in 1987 to prevent savings and loans from leaving the FSLIC and to save the insurance fund. *See* Competitive Equality Banking Act of 1987, Pub.L. 100–86, 101 Stat. I 52.

When this effort failed, Congress enacted the Financial Institution Reform, Recovery and Enforcement Act of 1989, Pub.L. 107–73, 103 Stat. 183. FIRREA abolished FSLIC and gave FDIC the responsibility for both funds. The law also eliminated or changed agreements that some savings institutions had with the Government. This court found that Congress breached these agreements when it passed FIRREA. The Federal Circuit and the Supreme Court agreed. *See Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995) (en banc), and *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). All Winstar-related cases were remanded to this court for further proceedings. Chief Judge Smith ruled for CalFed on summary judgment in 1998 and transferred the case to us for trial on damages.

### A. The First Trial

### Lost Profits

CalFed sought lost profits, restitution, and "wounded bank" damages in its breach of contract case against the United States in February 1999. Proof of expectancy damages was the topic of several pre-trial hearings in October and November 1998. We were concerned that the bank's lost profits claim relied not on documentary evidence but on expert testimony using investment strategies informed by hindsight. We reviewed CalFed's business plans, board resolutions, minutes, internal memoranda, and a lengthy Appendix containing corporate financial data, SEC filings, and similar material. A pre-trial order issued in November 1998 stated:

> Defendant knew that breaching this agreement would cause plaintiff to adjust its capital ratio. That is, it knew that plaintiff would have to reduce its assets or increase its capital. But it could not foresee what effect this adjustment would have on plain-

---

302 F.3d 1314 (Fed.Cir.2002).

**2.** "Plaintiff did not prove that shrinking the bank was a result of the breach, or even that it was

harmful. It may have been the result of prudent management decisions." *California Fed. Bank v. United States*, 43 Fed.Cl. 445, 459 (1999).

tiff's profits. Banking was a volatile and dynamic business ... [and] particularly speculative in these circumstances .... The Government promised to permit the use of goodwill as capital, but it did not guarantee plaintiff that its use of the additional leverage would be profitable.

*California Fed. Bank v. United States,* No. 92–138C (Fed.Cl. November 12, 1998).

### Wounded Bank Damages; Restitution Claim

Plaintiff argued at trial that bad publicity and other problems resulting from defendant's breach caused its cost of funds, deposit insurance premiums, and other assessments to increase, and made it difficult for the bank to compete. These "wounded bank" damages totaled $285 million. The bank also argued that it was entitled to nearly a billion dollars in restitution for its loss of the right to count supervisory goodwill as capital.

We issued an opinion in April 1999 denying both the wounded bank damages and the restitution claim. *California Fed. Bank v. United States,* 43 Fed.Cl. 445 (1999). A $23 million judgment for flotation costs reimbursed plaintiff's cost of raising new capital to replace the goodwill that it phased out because of defendant's breach. *Id.*

### B. The Federal Circuit

The Federal Circuit affirmed the ruling on restitution and the $23 million judgment for flotation costs. Plaintiff did not appeal the denial of wounded bank damages. The court remanded plaintiff's lost profits case because CalFed had provided evidence of "[b]oth the existence of lost profits and their quantum, [and these are] factual matters that should not be decided on summary judgment if material facts are in dispute." *California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1350 (2001) (citing RCFC 56(c)).

The Circuit noted plaintiff's allegations that it sold nearly 25,000 adjustable rate mortgages worth approximately $4 billion because of the breach, and that it was "forced to sell a profitable business unit, California

Thrift & Loan, to meet its capital requirements." *California Fed. Bank, FSB,* 245 F.3d at 1350. These assets and a third category of investments called "other foregone assets" comprise the bank's lost profits model.

### C. Trial on Remand

We completed six weeks of testimony in October 2002, followed by rebuttal and sur-rebuttal cases. Plaintiff offered one expert witness and several fact witnesses during the trial. The expert, Professor Christopher James, relied extensively on representations from bank management in crafting his lost profits model. Management's factual testimony was not sufficiently reliable to support his conclusions, however. Professor James was a persistent advocate for plaintiff on the merits. His opinions generally were not persuasive compared with those of defendant's experts, to the extent that they were in conflict.

Several of the bank's fact witnesses testified that absent the breach they would have retained profitable assets that Professor James uses in his model. These retrospective strategies were not always consistent with the bank's stated investment philosophy at the time. Professor James accepted such assertions uncritically.

## II. DISCUSSION

The breaching provisions of FIRREA precluded the use of goodwill as regulatory capital, thereby reducing the bank's capital ratios. Plaintiff had the options of raising new capital to improve its ratios or shrinking the bank's assets, or both. CalFed raised $800 million in new capital during the period 1989—1994. The total amount of goodwill phased out was not entirely clear at the second trial. Plaintiff's expert testified that $300 million was a reasonable approximation.[3]

Plaintiff alleges that FIRREA forced the sale of specific assets that it would have kept and that would have been profitable. These "foregone assets" are the basis for plaintiff's

---

**3.** We entered a $23 million judgment after the first trial to compensate plaintiff for its cost of raising approximately $400 million to replace

$390 million of lost goodwill. *California Fed. Bank v. United States,* 43 Fed.Cl. 445, 460 (1999).

lost profits model. The foregone assets consist of (1) nearly 25,000 adjustable rate mortgages; (2) a finance company called California Thrift & Loan; and (3) "Other Foregone Assets."[4]  Plaintiff's lost profits model traces the profitability of the forgone assets in the hands of their purchasers and assumes additional profits from these proceeds.[5]

CalFed likely would have sold most of its adjustable rate mortgages irrespective of the breach.  It would have sold California Thrift & Loan as well.  CTL did not fit management's "back-to-basics strategy."  Plaintiff did not prove that it was harmed by shrinking the bank or by raising new capital.  The bank's prudent business decisions enabled it to survive a serious real estate recession and to prosper.

Plaintiff did not prove that it would have made additional profits absent the breach.  *See, e.g., Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed.Cir.2002) (plaintiff was "required to demonstrate its entitlement to lost profits by showing the same elements that any business must show: (1) causation, (2) foreseeability, and (3) reasonable certainty.") (citation omitted).  We could not make a "fairly reliable estimate" of lost profits.  *Neely v. United States*, 152 Ct.Cl. 137, 147, 285 F.2d 438, 443 (1961).

### A.  Plaintiff's Lost Profits Model

Professor James' model is based on the difference between assets of the actual bank and the assumed assets of the bank if no breach had occurred.  These "incremental assets" make up the difference between the actual bank's real world assets and the assets of a no-breach bank with supervisory goodwill intact.

Information concerning profits from CTL and the divested ARMs is available, at least in the hands of the purchasers, but profits from "other foregone assets" are entirely speculative.  They are determined by applying a one percent return on investment, which cannot be documented, to "other foregone assets" that are not defined.  The one percent spread is based on an assumption that Professor James termed "conservative," explaining that he "looked at specific investments, mortgage-backed securities, certainly the ARMs, the kinds of assets that are consistent with the back-to-basics strategy."

One problem with the model's "other foregone assets" is how they would have been funded.  Professor James uses the three-month Merrill Lynch certificate of deposit rate plus fifty basis points as a "proxy" for funding these assets.  Management wanted to avoid such brokered deposits and to use retail deposits as much as possible.[6]

Professor James inflated profits on the "other foregone assets" by using short-term certificates of deposit for the funding proxy.  Retail deposits and longer-term CDs would have been more costly sources of funds.  Professor James used a funding proxy in his model that repriced frequently because he knows that interest rates declined during the early 1990's.  In reality, the bank thought that interest rates were going to rise during that period, and would not have taken such a gamble.

Dr. William Hamm was one of defendant's experts.  He showed that Professor James' proxy is purely speculative.  He presented a detailed and authoritative explanation of why the Merrill Lynch rate was not an appropriate proxy.  Plaintiff responded that such criticism "ignores the testimony of the fact witnesses."  This was a common response to expert criticism of Professor James' model

---

**4.**  "Forgone Assets" describes the three categories of lost profits in plaintiff's model.  "Other Forgone Assets" is a nebulous assortment of allegedly lost investment opportunities.

**5.**  *See, e.g., Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438 (1961), where defendant breached its agreement to allow plaintiff to strip mine coal.  The plaintiff viewed strip mining as being the only economical method in that circumstance, so it assigned the lease to another company and later sued for lost profits.  The court held that "the profit realized from these operations, if,

indeed, there were profits, would furnish some basis for a fairly reliable estimate of what plaintiff's profits would have been."  *Id.* at 147, 285 F.2d 438.

**6.**  For example, Mr. Dale Cohen testified that "[t]he back-to-basics strategy called for an emphasis on retail deposits.  So to the extent that retail deposits could be increased, then other wholesale funding sources would have been reduced, and brokered deposits would have been something that would have been considered to be reduced."

throughout the trial. Defendant's experts were asked many times on cross whether they were in a better position than management to know what the bank would have done in the non-breach world.

### B. California Thrift & Loan

Plaintiff argued on appeal that it was "forced to sell a profitable business unit, California Thrift & Loan, to meet its capital requirements." *California Fed. Bank, FSB,* 245 F.3d at 1350. CTL was an automobile finance subsidiary of the holding company that owned CalFed. Mr. Jerry St. Dennis, who became chief executive officer of CalFed in 1990, wanted to sell CTL because it did not fit into his "back-to-basics" plan for the company. He wanted to return the bank to traditional lending strategies that had made it successful. He did not view the automobile finance company as such a business.

The Office of Thrift Supervision required the bank to submit a plan in 1991 to improve its capital ratios. CalFed suggested that it could raise the capital by transferring CTL from the holding company to the bank and selling it. The bank achieved its capital ratio goals in 1993, so it was no longer necessary to sell CTL. The 1991 agreement with OTS released CalFed from all further obligations once the capital goals were reached. Mr. St. Dennis sold CTL a few months later anyway, despite objections from the board of directors. He testified that he felt a "moral obligation" to the regulators to sell CTL.

Mr. St. Dennis' representation that he sold CTL because he felt a moral obligation to the regulators was not persuasive. Moreover, the term "moral obligation" suggests the absence of a legal obligation. The decision to sell a profitable business on such a basis was one that defendant could not have foreseen. *See, e.g., Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1071 (Fed.Cir.2001) (independent business decision to obtain launch insurance was intervening cause that precluded award of damages) (citing *Myerle v. United States,* 33 Ct.Cl. 1, 27, 1800 WL 2024 (1897)).

Mr. St. Dennis wanted to sell the automobile financing business. He may have used the agreement with OTS to help him convince the board of directors. In any event, plaintiff was not forced to sell CTL because of the breach.[7]

### C. Adjustable Rate Mortgages

The Federal Circuit noted that CalFed "provided specific documentation of 24,664 single-family adjustable rate mortgages worth approximately $4 billion that it claims it was forced to sell to remain in capital compliance after the breach." *California Fed. Bank, FSB,* 245 F.3d 1342, 1349 (2001). Plaintiff "traced the actual post-sale performance of these loans and arrived at lost profits of $317 million attributable to those sales." *Id.* at 1349–50.

Plaintiff also sold approximately $4 billion worth of adjustable rate mortgages before the breach. The bank's business was selling loans, before and after the breach. Management witnesses testified at trial that they sold billions of dollars worth of ARMs before the breach only because of a need to "control growth."[8]

Selling ARMs was a profitable business for CalFed. Former CEO William Callendar wrote a letter to regulators in July 1991 stating that originating mortgage loans and selling them into the secondary market "should be viewed as an integral part of [CalFed's] operations …."[9] Mr. St. Dennis testified that the bank had a competitive advantage in selling loans after the breach as well as before. He acknowledged that the

---

**7.** Mr. St. Dennis tried to sell CTL in 1991 and 1992 but found little interest. The 1993 Board was opposed to the sale. He testified, "I told them we already had the authority to sell it, so it really wasn't an issue for them (the board) to decide."

**8.** It seemed reasonable that both the bank and the regulators would want to avoid uncontrolled growth, but we saw little evidence of a systematic or measurable policy in this regard.

**9.** "The bank has for several years been in the business of originating mortgage loans and selling them into the secondary market; one effective means of selling loans has been to securitize and create [mortgage-backed securities] from loans originated by the Bank …. [T]hese sales activities should be viewed as an integral part of [the Bank's] operations, not as part of its activities to maintain short-term liquidity."

bank's business plan for originating and selling ARMs did not change after the breach.[10]

Plaintiff was able to trace the post-sale performance of the mortgages that it sold because the bank retained servicing rights to the loans. That is, it collected payments, handled past-dues, and instituted foreclosure proceedings when necessary. Dr. Hamm testified that such performance information does not establish the revenue that the loans would have produced had they remained on CalFed's books.

Professor James filed corrected and supplementary expert reports to address errors concerning credit losses on the divested ARMs. His model does not account for nonperforming loans. He testified that some nonperforming loans would cure, but that did not appear to justify ignoring all nonperforming loans. Professor James explained that any overstatement of interest income was "comfortably offset" by his overstatement of credit losses in the model.[11] Assuming that errors in a lost profits model would tend to

offset each other seemed to be a haphazard method for an expert to use in approaching such an important case as this one.

Professor James did not identify liabilities that the bank would have used to finance the ARMs had they not been sold. According to Dr. Hamm, without such information, "any opinion about lost profits is speculative . . . . [T]he spread that Professor James calculates on these ARMs, it's not a product of analysis; it's a product of assumption . . . ."

CalFed's fact witnesses testified that management worried almost daily about the impact of phasing out goodwill, yet no memorandum in the record documents such concerns. Plaintiff's witnesses testified about regular meetings to discuss the problem, but did not submit notes of such meetings, minutes, internal memoranda, or even memos to file. Not one contemporaneous written reference is made to selling the ARM portfolio because of the phase-out of goodwill.[12]

---

10. The bank's 1990 business plan included the following: "Sales of mortgage loans will be $1 billion in 1990, as part of the plan to control growth in total assets, as well as to take advantage of CalFed's capacity to originate a large volume of fixed and adjustable mortgage loans . . . ."

11. Some potentially important information concerning credit losses was not made available to defendant in discovery. Defendant moved for sanctions and for an inference by the court that the information would have been adverse to plaintiff's case. We have not addressed sanctions or made such inferences.

12. Defendant played a video during the trial of Mr. James Hurley, a senior vice president of the bank, explaining to shareholders why CalFed's stock price was dropping. We include a transcript of the video here because of what Mr. Hurley does not tell the shareholders. He makes no reference to selling billions of dollars of ARMs because of the phase-out of supervisory goodwill, or for any other reason. A year after the breach, Mr. Hurley makes no reference FIRREA at all: (INTERVIEWER): Obviously right now you're spending a lot of time talking to people on the phone about our current stock price. What do you see as the crux of the issue right now? (MR. HURLEY): First of all, you can tell any member of our division in the hallway by the permanent crook in their neck from answering the telephone over the past six weeks or so. Calls have been particularly heavy, and we've taken probably as many as 100, 130 calls a week

from investors of all kinds, and news media and so on. It's been a tough time, because there is so much embedded pessimism, a lot of it unjustified, in the marketplace about CalFed stock. This pessimism has developed as a result of an international issue, the Persian Gulf crisis, national issues, the federal budget and interest rates, regional issues, such as the California real estate economy, and some specific issues that relate directly to CalFed. The crisis in the Persian Gulf has caused investors to defer decisions on major investments such as homes. The number of borrowers has dropped off very, very sharply. So there's still interest on the part of consumers in the big ticket purchases, the home and the car, but they have deferred their purchases to some extent, to a large extent perhaps, until such time as there's a resolution in the Persian Gulf. The national issue, the federal budget, looks like at this point anyway the president may have achieved passage of that. Depends on what Congress does, and as we sit here, there's still arguments on both sides of the Hill about whether the budget is the right one for us. But that is going to have some impact on whether consumers are willing to spend their money or continue to defer spending it until such time as we reach a calmer state. The regional issue, and this is probably the overriding issue with respect to CalFed stock, is the California real estate market. As we know, Guy, on Wall Street, perception is reality. And this pessimism is exacting a toll on all financial services stocks today. The California real estate environment is perhaps the most important element in this whole issue of

Most of the bank's residential one-to-four family loans were located in Southern California, which was more severely affected by the recession than any other area. These loans were put on the books during 1998—1991, and they were highly vulnerable to delinquencies. The bank sold these loans at a profit after the breach, and now claims the phase-out of goodwill as the reason.

While plaintiff was selling ARMs after the breach, it was putting higher-risk loans on the books, including consumer loans, construction loans, and commercial loans.[13] CalFed referred to the divested ARMs at trial as its "crown jewels," and portrayed their sale as a desperation move necessitated by their liquidity and their certain value. Plaintiff could have remained in capital compliance without selling all of the ARMs, however. The bank likely would have sold many or most of its adjustable rate mortgages had the breach not occurred.[14]

### D. Other Foregone Assets

The largest category of alleged lost profits in Professor James' model is $253 million of "other foregone assets." These are damages that plaintiff claims it suffered because the breach required it to "forego making highly profitable loans ...." *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001). CalFed asserted that it would have retained all the divested ARMs absent the breach. Mr. Brummett testified that the portfolio would have diminished over time as the loans matured, and that the bank would have replaced them with profitable loans and investments. CalFed would have

---

pessimism over financial services stocks. And CalFed in particular. Eastern investors who have been battered by a true real estate recession themselves, which started in the commercial office building market and moved into residential, multifamily and single family residential markets, has really hurt them back there. And the perception by many institutional investors in the east is, is that the weakness in the California commercial office building market is going to migrate into the multifamily and residential real estate markets much in the way it did in New York. We see no evidence of this at all. As you know, California has always been the stronghold of real estate values, and it still deserves that appellation with respect to the residential and multifamily markets.
(QUESTION): So the general factors, international, national and regional, will affect all financial institutions, not just CalFed? It explains the depression of stock, but not completely. You had mentioned some of the specific instances correlated to CalFed. Can you talk about that a minute?
(ANSWER): Sure. It just has to be said out of a sense of fairness, Guy, that there are some specific issues that are motivating investors to devalue CalFed's stock other than the stock of our competitors. And these issues represent the margin between how badly we've been battered and how badly our competitors have been battered. One of those issues is the issue of the so-called New York loan. We have $160 million loan in New York that we made in 1983 to a world class borrower, a blue chip borrower, and the loan has performed absolutely textbook perfect, up until the time when in February of this year, one of the major tenants of this building, a household word by the name of Drexel Burnham Lambert, filed for bankruptcy, and at that time they moved out of the building and pinched off some of the cash flow to the borrower. The borrower has kept the loan current right up to now, right up to

snuff, and he insists that the last thing he wants to do is see this loan come back to us. We believe that's the case, because he has an international reputation to protect. It would be too glib to say we're not worried about this loan. We're watching it very, very carefully. But the anxiety over this loan is exaggerated by the real estate—weakness in the real estate markets.
(QUESTION): What else?
(ANSWER): The other issue is $125 million in bonds that CalFed, Inc. issued in 1986. These bonds are redeemable in February of 1993, which is a long time away, but in today's pessimistic environment, investors don't look at the calendar longer than today or next week. So there has developed a sense of anxiety on the part of some investors as to whether or not CalFed can stand behind these bonds. There is absolutely no question in our minds that we'll be able to hold up our end of the bargain on these bonds.
(END OF VIDEO)

13. Relatively higher risk loans require higher capital ratios. Mr. Gary Brummett explained that assets are assigned levels of risk by the regulators and require varying capital ratios to support them. For example, treasury bills are zero percent risk-weighted, while single-family mortgage loans were fifty percent during this period. Property loans, commercial banking loans, and direct real estate investments were one hundred percent risk-weighted.

14. The bank had a number of good business reasons to sell the ARMs. For example, management wanted a higher ratio of tangible net worth to tangible assets, which the sale accomplished. Also, Professor James' report shows that the bank recorded capital gains of $28 million from the sale, which it used to offset losses.

originated new loans, purchased whole loans or mortgage-backed securities on the secondary market, or invested in other market securities.

We could not determine during the trial what assets were included in this category. Plaintiff could not explain credibly how it would have supported these highly profitable loans if it could have made them, or why they would have been highly profitable. Professor James projected a return of one percent on all "other foregone assets." [15] Evidently these profits would have been added to retained earnings, which then would have been used to support the new assets that plaintiff claims it had to forego because of the breach.[16] Though Professor James could not identify these other foregone assets, his model assumes that they will be consistently profitable for forty years.[17]

### III.  LEGAL STANDARDS

■ The Federal Circuit recently summarized the law on expectancy damages in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed.Cir.2002):

> To recover lost profits for a breach of contract, the plaintiff must establish by a preponderance of the evidence, *see Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 204 (1st Cir.1995), that: (1) the loss was the proximate result of the breach; (2) the loss of profits caused by

**15.** Plaintiff's historic return on assets showed a maximum of .72%, and an average of negative .57% during the period 1990–1996. Professor James did not explain why he expected the bank to make an average return on assets of one percent through 2022 in light of this information except that it was "reasonable," and even "conservative."

**16.** Retained earnings would cost the bank less than retail deposits, or other interest-bearing liabilities that would have reduced plaintiff's profits had Professor James used those sources instead.

**17.** Dr. Hamm testified that it was unreasonable to assume a one percent return on assets for a number of reasons. As one example, market factors would limit the bank's opportunities to add profitable assets. The record of this trial contains many references to the highly competitive environment in which the bank was operating at the time. Dr. Hamm's emphasis on the importance of distinguishing between assets and

the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. *See Chain Belt Co. v. United States*, 115 F.Supp. 701, 714, 127 Ct.Cl. 38, 58 (1953); Restatement (Second) of Contracts § 351(1) (1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). *See also California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1349 (Fed.Cir.2001) ("Lost profits are a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made.") (quoting *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961) ("*Neely I*")).

*Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324–25 (Fed.Cir.2002).

#### A.  Causation

■ Plaintiff must prove that defendant's breach caused it to lose profits, "inevitably and naturally, not possibly nor even probably." *Myerle v. United States*, 33 Ct.Cl. 1, 27 (1897).[18] We ruled in the first trial that

profitable assets, and growth and profitable growth, was persuasive. Mr. St. Dennis seemed to agree when he stated that "growth is not the objective—profitability is the objective."

**18.** The trial court in *Energy Capital*, a case affirmed and apparently well-regarded by the Federal Circuit, suggests that *Myerle* has been supplanted by a less strict test of whether defendant's breach was "a substantial factor" in causing the injury. *Energy Capital Corp. v. United States*, 47 Fed.Cl. 382 (2000). The Court of Federal Claims rejected the notion that damages from the breach must be "inevitable," and required only that the plaintiff "prove that the breach was a 'substantial factor' in causing its losses, the test in the majority of jurisdictions." *Energy Capital*, 47 Fed.Cl. at 395. We have not considered whether *Myerle* has been overruled, but plaintiff's counsel agreed that damages must flow "naturally and inevitably" from the breach. If the standard has changed, the result in this case nevertheless remains the same.

CalFed "did not prove that shrinking the bank was a result of the breach, or even that it was harmful. It may have been the result of prudent management decisions." *California Fed. Bank v. United States,* 43 Fed.Cl. 445, 459 (1999).

Mr. St. Dennis testified that shrinking the bank for any reason was "generally a very bad idea." Mr. Brummett added, "if we were bigger, we would have made more money." These statements are not supported by the record of this trial. CalFed lost $20 million in 1990 with $20 billion in assets; it earned a profit during 1995–1996 with less than $15 billion in assets. Shrinking the bank in the midst of a serious recession in fact was a very good idea for CalFed.

### B. Foreseeability

■ The effect of independent business decisions on foreseeability is discussed in *Myerle v. United States,* 33 Ct.Cl. 1 (1897). "For damage to be direct there must appear no intervening incident . . . ." *Id.* at 27.

> But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.

*Id.* at 26.

When damages are foreseeable, a "jury verdict" approach to calculating them may be appropriate. *See, e.g., Bluebonnet Sav. Bank, FSB v. United States,* 47 Fed.Cl. 156 (2000), *rev'd on other grounds,* 266 F.3d 1348 (Fed.Cir.2001). That case contrasts with plaintiff's foreseeability argument here. The agreement breached in *Bluebonnet* was a regulatory forbearance directly addressing payment of dividends. The plaintiff claimed that it experienced increased costs of financing as a result of not having available to it the dividends that defendant promised. The trial court found that "it was foreseeable under the circumstances that [plaintiff] would incur the increased financing costs they now claim without dividends to assist in obtaining additional loans and repaying existing debt." *Bluebonnet Sav. Bank, FSB v. United States,*

47 Fed.Cl. 156, 172 (2000), *rev'd on other grounds,* 266 F.3d 1348 (Fed.Cir.2001).

According to plaintiff, the Federal Circuit held implicitly in our case that lost profits were foreseeable at the time of contracting. We do not see such a holding in the Circuit's opinion. The court ruled only that plaintiff submitted sufficient genuine issues of material fact to avoid summary judgment on lost profits. "Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *California Fed. Bank, FSB,* 245 F.3d at 1350 (citing RCFC 56(c)).

Defendant could not have foreseen at the time of contracting that plaintiff would make a management decision to sell CTL because of a "moral obligation" to do so. It could not have foreseen plaintiff's independent decision to sell nearly 25,000 adjustable rate mortgages after the breach.

> The damage must be such as was to have been foreseen by the parties, who are assumed to have considered the situation, the contract, and the usual course of events; but eliminated from this consideration must be any condition of affairs peculiar to the contractor individually in the particular case and not of general application under similar conditions. There must not be two steps between cause and damage.

*Myerle v. United States,* 33 Ct.Cl. 1, 27 (1897). Plaintiff's sale of CTL and its ARM's are the sorts of "independent and collateral undertakings" that the Court of Claims considered to be too remote and too uncertain to allow recovery for their consequences. *See Myerle,* 33 Ct.Cl. at 26 (citing *Fox and Another v. Harding and Another,* 61 Mass. 516, 7 Cush. 516 (1851)).

Defendant could not have foreseen the effects of the California real estate recession. For two years after FIRREA, plaintiff's business plans projected continued growth, not shrinkage. The recession caused CalFed to shrink the bank. Management did not view the new law, including the phase-out of

goodwill, as a bad thing.[19] The bank thought that FIRREA would be an opportunity to position the bank at a competitive advantage compared to other thrift institutions that were not so well-managed.

Plaintiff argues that foreseeability can be determined by the purpose of a contract, and that courts have recognized the importance of defendant's promise that goodwill could be counted as capital. The Supreme Court held that goodwill promises "allow[ed] the thrift to leverage more loans (and, it hoped, make more profits)." *United States v. Winstar Corp.*, 518 U.S. 839, 851, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The non-breaching party is entitled to "benefits he expected to receive had the breach not occurred." Restatement (Second) of Contracts § 344(a). The benefits that plaintiff expected to receive were ("it hoped") higher profits from the ability to leverage goodwill as though it were capital. Plaintiff did not prove that losing goodwill or replacing it with tangible capital affected its profits adversely.

Management sold the divested assets for business reasons. CTL did not fit the bank's investment strategy and it sold for $30 million. Plaintiff sold nearly 25,000 adjustable rate mortgage loans despite a severe real estate recession and recorded capital gains of $28 million to help offset its losses.

We agree with plaintiff's statement that, "CalFed has demonstrated ...[that the Government] foresaw, or should have foreseen, that a breach of its goodwill promises could cause CalFed to shrink." *See, e.g., California Fed. Bank, FSB*, 245 F.3d at 1350 (government "knew that breaching this agreement would cause [CalFed] to adjust its capital ratio. That is, it knew that [CalFed] would have to reduce its assets or increase its capital."). Plaintiff adds, however, that such evidence also shows that the Government understood that reduction in asset size would reduce the thrift's earning capacity. This part of plaintiff's argument does not follow logically, and it is not sup-

ported by the record of this trial. Defendant "could not foresee what effect this adjustment would have on plaintiff's profits. The Government promised to permit the use of goodwill as capital, but it did not guarantee plaintiff that its use of the additional leverage would be profitable." *See California Fed. Bank v. United States*, No. 92–138C (Fed.Cl. November 12, 1998) (Order).

## C. Reasonable Certainty

■ "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001) (quoting *Locke v. United States*, 151 Ct.Cl. 262, 267, 283 F.2d 521, 524 (1960)). The fact that plaintiff would have made a profit must be "definitely established, and [there must be] basis on which a reasonable estimate of the amount of the profit can be made." *California Fed. Bank, FSB*, 245 F.3d at 1349 (quoting *Neely v. United States*, 152 Ct.Cl. 137, 147, 285 F.2d 438, 443 (1961)).

> The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.

*Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001) (internal quotations and citations omitted).

Plaintiff contends that *Bluebonnet* and similar cases support a judgment in its favor so long as the court can make a "reasoned inference" as to the amount of damages chargeable to defendant. (quoting *Chalender v. United States*, 127 Ct.Cl. 557, 566, 119 F.Supp. 186, 192 (1954)). The Government as the breaching party should not benefit from any difficulty that the bank might have in proving damages, plaintiff argues. *See, e.g., Energy Capital*, 302 F.3d at 1327 ("[T]he

---

**19.** Mr. St. Dennis attributed the bank's return to profitability in 1995 to "the results of its restructuring in prior years to meet the new capital requirements of FIRREA." He thought the enactment of FIRREA was a benefit not only to CalFed but also to the entire industry. Former

CEO Mr. Callender testified that FIRREA caused the bank to sell high-risk loans and non-performing loans. The record contains many positive references to Congress' action and the importance of increasing tangible capital ratios. Goodwill is not tangible capital.

risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages.") (internal quotations omitted).

CalFed did not prove its lost profits case using these standards or any others that are discussed in the case law. Plaintiff did not establish damages from the category that it describes as "other foregone assets." We found no basis for determining lost profits with reasonable certainty, by reasoned inference, or by reasonable estimate. Such a finding would be purely speculative.

## IV. OTHER ISSUES

CalFed's responses to defendant's criticism of Professor James' testimony and his lost profits model was that such criticism ignored the testimony of plaintiff's fact witnesses. Professor James made the same point often, and criticized defendant's experts on that basis. Professor James' model depends entirely on what he was told by management. His reliance on management was absolute and at times naive. We did not find such an approach to be helpful in this case. Professor James did not express expert opinions on whether it was necessary for the bank to sell adjustable rate mortgages after the breach; whether CalFed would have raised capital in 1989 and 1990 irrespective of the breach; or whether it was necessary to sell CTL or the adjustable rate mortgages because of the breach. Professor James' trial testimony and that of several management witnesses occasionally was inconsistent with their deposition testimony.

Several fact witnesses were paid litigation consultants for CalFed, and have been for years. At least two witnesses have owned warrants for shares of any judgment that plaintiff could have been awarded in this case. One witness testified that the value of his warrants was "less than one percent of

my net worth," an odd and meaningless response to a question about the extent of his financial stake in the outcome of this case.

CalFed issued offering circulars in 1995 and 1996 to potential investors in shares of a judgment in this case. The Securities and Exchange Commission requires disclosure of all material facts concerning the litigation in such circumstances. CalFed listed in the offering circular four causes of damage to the bank as a result of defendant's breach. Not one was argued in plaintiff's case during this trial. The damage theories that plaintiff presented to this court to support a judgment of over a half-billion dollars against the Government are not mentioned in the circular. In fact, plaintiff now states that the damages listed in the circular would have occurred irrespective of the breach.

Several CalFed witnesses attempted semantic twists of language from the circular to encompass the sale of ARMs. Such efforts only harmed the credibility of their testimony.[20] Material disclosures should have been expressed clearly in the offering circular as required by the SEC, if they were valid.

Mr. Doug Wallis was CalFed's General Counsel and was responsible for drafting the offering circular. He testified that the sale of adjustable rate mortgages as an element of damages was not a consideration for him when the circular was drafted.[21] Even so, he attempted to force that meaning into the language of the circular during his testimony. He referred to the phrase "income-earning assets" as one that could include the sale of single-family adjustable rate mortgages. His explanation of how the offering circular could be interpreted to include adjustable rate mortgages was strained at best, and his testimony concerning CTL and the

---

**20.** One witness testified that the sale of ARMs, which represents seventy percent of the damages claimed from the breach, was not mentioned in the offering circular because "it was obvious." Another suggested that the ARMs could be found in language such as "including without limitation," or "in part."

**21.** Q Did it occur to you, sir, in 1995 that an investor could look at that term "income-earning

assets" and not know what type of assets CalFed was referring to?

A In 1995, I never even thought about that. I never thought about any of the things we're discussing today in 1995.

Q You weren't thinking about adjustable-rate mortgages, were you ... in connection with the offering circular.

A That's correct.

bank's "moral obligation" was not credible.[22] As an attorney for the bank, he had challenged regulators on the enforceability of other agreements, including capital maintenance agreements applicable to the holding company. He included in the bank's 1991 10–K filing, "the parent company believes that substantial legal questions exist as to whether there is an enforceable obligation, agreement or stipulation pursuant to which it can be required to make a capital contribution to the bank."

## V. REPLACEMENT OF CAPITAL

The 1995 offering circular states:

Further, as a result of its loss of regulatory capital after FIRREA, the Bank was required to restructure shareholder equity .... During the phase-out period (1989–94), the Bank raised $346 million of new common equity and $266 million of noncumulative preferred equity, in part, to replace the Supervisory Goodwill that was no longer includable in the Bank's regulatory capital.

We ruled after the first trial that CalFed was successful in replacing its goodwill, and in fact never fell out of capital compliance. "The costs of raising replacement capital are the damages that we award by this opinion ...." *California Fed. Bank v. United States*, 43 Fed.Cl. 445, 460 (1999). These damages were calculated by plaintiff's cost of raising over $400 million in capital to replace the $390 million of goodwill that plaintiff lost as a result of the breach. The cost of raising capital necessary to replace the lost goodwill was approximately $23 million.

This holding was affirmed by the Federal Circuit on appeal. "We see no clear error in the court's factual finding that the flotation costs provided an appropriate measure of CalFed's damages incurred in replacing the supervisory goodwill with tangible capital." *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920 (2002). Defendant argued that plaintiff could not show lost profits after the goodwill was replaced, and that any such testimony would be improper according to the law of the case doctrine. We did not rule on defendant's motion *in limine* at the time because of the Federal Circuit's remand order. The issue is now moot and defendant's motion therefore is DENIED.

## VI. CONCLUSION

Plaintiff did not satisfy any of the legal requirements that would entitle the bank to lost profits. If the bank had proven even some damages, uncertain only as to amount, arguably we could have made a jury verdict award. It did not, however. Even if plaintiff had satisfied the legal requirements, it could not have recovered because the witnesses did not provide a credible factual basis for supporting damages.

Defendant breached plaintiff's contract. The results could have been serious, as they have been in other cases. But the Government did not take "real" assets from the bank. Congress required plaintiff to remove from its books an accounting entry and to replace it with tangible capital. All of the new capital went into the bank, and the bank benefitted.

Defendant often argues that the Government did plaintiff a favor by breaching its contract. It is not necessary to address this point, but in fact the bank replaced its super-

---

**22.** Q  Did CalFed feel *some sort* of moral commitment to the regulators that was leading it to sell CTL in 1993?

A  Well, we had agreed to sell it in the capital plan. I guess that's a moral commitment. It was an agreement with the regulators.

Q  [D]id CalFed feel a moral commitment to sell CTL, *even if it wasn't required* under the terms of the agreement?

A  Because it was a part of the capital plan, we felt we had agreed to sell it, and we did, in fact, sell it.

Q  Did CalFed feel a moral commitment to sell CTL, even if it did not need CTL to meet its capital requirements and even if the plan was no longer in effect?

A  Yes, because we had included it in the capital plan .... We had committed to the regulators in the capital plan to sell it, and we felt that we had to make good on that commitment.

visory goodwill and streamlined its books to meet new capital requirements. Through shrinkage, the bank reduced its exposure to severe losses during a serious recession. Many banks in similar circumstances did not survive.

The Clerk will dismiss plaintiff's complaint. No costs.